Kenneth H. Frenchman (kfrenchman@cohenziffer.com)
Meredith Elkins (melkins@cohenziffer.com)
COHEN ZIFFER FRENCHMAN & MKENNA LLP
1350 Avenue of the Americas
New York, New York 10019

*Attorneys for Plaintiff The John Gore Organization, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------

|  |  |  |
|---|---|---|
| THE JOHN GORE ORGANIZATION, INC., | : | Civil Action No.: |
|  | : |  |
| Plaintiff, | : | **COMPLAINT** |
| v. | : |  |
|  | : | **JURY TRIAL DEMANDED** |
| FEDERAL INSURANCE COMPANY, | : |  |
|  | : |  |
| Defendant. | : |  |

------------------------------------------------------------------------

Plaintiff The John Gore Organization, Inc. ("JGO" or "Plaintiff"), by and through its undersigned attorneys, as and for its Complaint against Federal Insurance Company ("Federal" or "Defendant"), alleges as follows:

## INTRODUCTION

1.      This diversity action for breach of contract and declaratory judgment arises out of Federal's refusal to provide the coverage it owes under a commercial property insurance policy for JGO's significant business losses arising out of the novel coronavirus outbreak and ongoing COVID-19 pandemic.

2.      JGO is the leading developer, producer, distributor and marketer of Broadway theatre worldwide. JGO's family of companies and brands includes, among others, Broadway Across America ("BAA"), Broadway.com, The Broadway Channel, BroadwayBox.com, Group Sales Box Office, and Broadway Classroom. Its productions span Broadway, Off Broadway,

and 47 other North American markets, including markets in Canada and Mexico.  With regard to

BAA, JGO provides booking, presenting, ticketing, advertising, and other services to venues and

various "co-presenters" throughout the U.S., Canada, and Mexico for touring musicals and plays.

JGO also owns and/or operates five venues located in Baltimore, Maryland; Boston,

Massachusetts; and Minneapolis, Minnesota.  JGO provides booking, presenting, ticketing,

advertising, and other services to these venues for BAA shows in addition to any other shows

that get booked at the venue.  The businesses of Broadway.com, BroadwayBox.com, and Group

Sales Box Office (including Broadway Classroom) are centered around New York City and,

specifically, Broadway.  Through these companies, JGO provides the public with resources such

as industry and show information, editorial coverage, ticketing, discount codes, and advertising

for Broadway and Off Broadway shows in New York and educational experiences for students.

3.      Unfortunately, JGO's specialty focus on Broadway theatre made it particularly

vulnerable to the novel coronavirus.  In March 2020, with confirmed cases of coronavirus

already present in many, if not all, of the states where JGO operates, state and local governments

began banning large gatherings and implementing stay-at-home orders to stem the spread of the

pandemic (collectively, the "Orders").  The Orders generally banned gatherings of as few as 10

people, directed all non-essential businesses—such as theater companies—to cease operations,

and permitted residents to leave their homes only for limited purposes such as getting groceries

or medicine or to perform essential jobs.  Like many government officials across the country,

New York City Mayor Bill de Blasio explained that these drastic measures were needed because

of the unique characteristics of the novel coronavirus and, of particular relevance here, "because

the virus physically is causing property loss and damage[.]"

4.      The novel coronavirus outbreak, which has caused physical loss or damage to JGO's premises, including its offices, and dependent venues (and/or nearby properties) and JGO's owned or operated venues, and the resultant Orders, most of which have been renewed and extended multiple times, have devastated JGO's business.  Overnight, the lights of Broadway, and theaters around the world, went dark—leading to the immediate suspension of all performances and decimating JGO's business.  Many of the shows for which JGO provides booking, presenting, ticketing and advertising services have been cancelled or postponed, forcing JGO to issue millions of dollars in refunds and to incur millions more in lost sales.   JGO has suffered, and continues to suffer, substantial financial losses.  JGO expects to suffer additional substantial losses from lost sales, as well as other losses and expenses in connection with the pandemic.  These losses are expected to continue indefinitely, given that even after the Orders are lifted, a return to normalcy and the restoration of public confidence in the safety of large group gatherings, such as live theatrical events, will take many months, if not years, with the possibility of reduced attendance at such events in the interim.  Further, once the Orders are lifted, JGO will incur significant additional costs to clean and improve safety and sanitation measures.  These measures include but are not limited to installing hand sanitizing stations, plexiglass shields, and COVID related signage, as well as enhancing HVAC systems, creating a touchless environment, and implementing health screening and contact-tracing measures.

5.      Fortunately, like many prudent business owners, JGO had the foresight to purchase insurance for "business interruption" that covers the very risk to its business that materialized during the pandemic.  In exchange for substantial premiums, JGO purchased commercial property insurance from Federal that covers "direct physical loss or damage . . .

3

caused by or resul[ting] from a **covered peril**[1]" and does not contain a virus exclusion, policy no. 7954-42-79 (the "Policy," attached as **Exhibit A**).

6.      Relying on the terms of the Policy, JGO promptly wrote to Federal and made a claim for coverage under the Policy following its initial losses caused by the pandemic and the related closure Orders.  However, in this time of crisis, Federal did not act to reimburse JGO's losses.  Instead, after JGO cooperated fully with multiple requests for additional information, Federal refused to provide coverage for JGO's losses via letter dated July 31, 2020 (the "Denial Letter," attached as **Exhibit B**).

7.      In the Denial Letter, Federal acknowledged that "many scheduled events have been postponed and cancelled" and that it was Federal's "understanding [that] this issue is directly related to the outbreak of the Coronavirus (COVID-19)."  Federal further acknowledged in the Denial Letter that JGO "has sustained a business income loss resulting from the partial and full suspension of operations at multiple member facilities," that there were "numerous Executive Orders of civil authority impacting [JGO's] business that were issued in multiple jurisdictions in which [JGO] conduct[s] business," that "the primary purpose of the Executive Orders issued by the various different governmental officials impacting [JGO's] operations was to curtail the spread of the COVID-19 virus," and that "one or more Executive Orders at issue also state that COVID-19 has or may cause and/or contribute to physical property loss and/or damage due to its purported propensity to spread and/or its proclivity to adhere to surfaces."

8.      Astonishingly, despite these acknowledgements and the fact that the Policy does not include a virus exclusion, Federal denied JGO coverage under the Policy because they claimed—without any apparent investigation—that "none of these Orders were issued as a result

---

[1] Terms in bold or capitalized in this Complaint appear in that manner in the Policy.

of any direct physical loss or damage to the Insured Premises" and there was no "particular physical loss or damage either at [JGO's] premises or within any specific geographical range of [JGO's] premises."  Federal went on to state that no coverage was available under the Policy as "[a]ccess to [JGO's] premises [and dependent venues] was not prohibited" because "at all relevant times, [JGO's premises and dependent venues were] accessible for essential administrative duties."  Federal's denial of coverage for JGO's losses lacks any justifiable basis in law or fact.

9.      Federal's position contravenes the plain meaning of the Policy language and case law in New York and across the country interpreting the same or similar language.  Moreover, in direct contrast to most other property insurance policies in the marketplace, the Policy does not include any exclusion for viruses.

10.     As a result, JGO has been forced to bring this breach of contract action through which it seeks damages and a declaratory judgment that its losses are subject to the coverage under the Policy it purchased, which it so badly needs.

## THE PARTIES

11.     Plaintiff JGO is a corporation organized under the laws of Delaware, with its principal place of business at 1619 Broadway, 8th & 9th Floors, New York, New York 10019.

12.     Upon information and belief, Defendant Federal is a corporation organized under the laws of Indiana with its principal place of business at 251 North Illinois, Suite 1100, Indianapolis, Indiana 46204.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties to this action and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

**I.     The Coronavirus Outbreak**

15.     In December 2019, during the term of the Policy, an outbreak of illness known as COVID-19 caused by a novel coronavirus formally known as SARS-CoV-2 was first identified in Wuhan, Hubei Province, China.  In an event that has not occurred in more than a century, a pandemic of global proportions ensued, with the virus quickly spreading to Europe and then to the United States.

16.     From the first reported case in the United States in January 2020 to the present, the impact of the coronavirus on life and property has been staggering.  And, specifically, the impact on businesses such as JGO whose livelihood depends on travel, tourism, and large indoor gatherings, has been particularly acute.

17.     As of February 26, 2020, the Centers for Disease Control and Prevention ("CDC") warned that community transmission of the disease existed in the United States.  The coronavirus was spreading with no ability to trace the origins of new infections.[2]  Moreover, the nature of the virus has made its containment particularly challenging.  Numerous scientific studies and articles have identified that the virus spreads when droplets from an infected person land on objects and surfaces and then, after contact with the infected objects and surfaces, other individuals touch their eyes, nose, or mouth.

18.     Indeed, according to the CDC, "everyone is at risk for getting COVID-19."  Per the CDC and the World Health Organization (the "WHO"), a person may become infected by:

---

[2] *CDC Confirms Possible Instance of Community Spread of COVID-19 in U.S.,* CDC Newsroom (Feb. 26, 2020), *available at* https://www.cdc.gov/media/releases/2020/s0226-Covid-19-spread.html (last visited Mar. 1, 2021).

(1) coming into close contact (about 6 feet) with a person who has COVID-19; (2) absorbing respiratory droplets when an infected person talks, sneezes, or coughs; or (3) touching surfaces or objects that have the virus on them and then touching his or her mouth, eyes, or nose.

19.     An experiment commissioned in Japan underscores just how easily the virus spreads.[3]  The experiment involved 10 individuals, one who played the infected person. Fluorescent paint was applied to that person's palms to replicate what might happen after a sneeze was covered with the hands.  All 10 individuals then ate a buffet-style meal for just 30 minutes before a black light was used to track the spread of the "virus."  Traces of the fluorescent paint had spread to numerous dishes, the faces of three people, and the hands of *all* 10 participants.

20.     COVID-19 is not only highly contagious but deadly.  According to the CDC more than 28 million Americans have contracted the disease, of which more than 500,000 have died.

21.     Besides being deadly, the virus is challenging to contain because infected individuals can be asymptomatic, and thus unaware that they may be spreading the virus by merely breathing, speaking, or touching objects and surfaces.  Indeed, studies have estimated that more than 40% of infected individuals may never develop any symptoms.[4]  .

22.     Though droplets carrying the virus are not visible, they are nonetheless physical objects, carrying a physical substance, that attach to and cause harm to property.  Studies have

---

[3] *See How Easily COVID-19 Might Spread Through A Restaurant In This Black Light Experiment*, KXAN (May 16, 2020, 12:02 AM), *available at* https://www.kxan.com/news/coronavirus/see-how-easily-covid-19-might-spread-through-a-restaurant-in-this-black-light-experiment/ (last visited Sept. 16, 2020).

[4] Erika Edwards, *Asymptomatic COVID-19 Cases May Be More Common Than Suspected*, NBC News (May 27, 2020, 6:30 PM)*, available at* https://www.nbcnews.com/health/health-news/asymptomatic-covid-19-cases-may-be-more-common-suspected-n1215481 (last visited Mar. 1, 2021).

shown that the virus can actively persist on a whole range of surfaces including stainless steel, wood, paper, plastic, glass, ceramic, cardboard, and cloth.

23.     And unlike many other viruses that are unable to remain active for long periods of time outside the body, the novel coronavirus is resilient and survives on surfaces for days and even weeks.  For instance, the CDC reported that the virus was identified on surfaces on the *Diamond Princess* cruise ship 17 days after cabins were vacated.[5]  The virus thus compromises the physical integrity and condition of the structures it permeates and poses an imminent risk of physical damage to surrounding structures.  The virus likewise renders such structures unusable for their intended purpose.

24.     The coronavirus also continues to evolve, further stymying efforts to control the pandemic.  Multiple variants of the coronavirus are circulating globally, including variants originating in the United Kingdom, South Africa, and Brazil.[6]  Early research suggests these variants may spread more easily and quickly, and the United Kingdom variant may be associated with an increased risk of death, making the coronavirus evermore dangerous.  The presence of all three variants in the United States has been confirmed.

## II.     Coronavirus Causes Direct Physical Loss and Damage

25.     By mid-March, it became clear that drastic action had to be taken to slow down the rate of infections.  Nationwide, state and local governments began to act to stem the tide of

---

[5] Leah F. Moriarty et al., *Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020*, CDC Morbidity and Mortality Weekly Report (Mar. 27, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited Mar. 1, 2021).

[6] *About Variants of the Virus that Causes COVID-19*, CDC (updated Feb. 12, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html (last visited Mar. 4, 2021).

the virus.  Government officials of states, counties, and cities where JGO premises and

dependent venues are located declared states of emergency to limit the spread of the virus.  They

issued Orders suspending or severely curtailing the operations of all non-essential or high-risk

businesses, banning gatherings of more than 10-50 people, and requiring individuals to "shelter

in place," stay in their homes, and not to travel except to receive medical care, buy groceries, or

perform essential jobs.  These Orders directly impacted the ability of theaters to present the

shows for which JGO provides booking, presenting, ticketing, advertising, and/or other services.

26.     For example, on March 12, 2020 and March 22, 2020 respectively, New York

Governor Andrew Cuomo issued a ban on large gatherings (the "New York Gathering Order")

and a stay-at-home order that closed non-essential businesses and operations and directed

residents to remain at home except for limited, essential purposes (the "New York Stay-at-Home

Order").  New York City Mayor Bill de Blasio also issued a stay-at-home order in mid-March in

which he recognized that "the virus physically is causing property loss and damage."

27.     Similar orders were issued in other states where JGO premises and dependent

properties are located, with similar effects.  For example, on March 31, 2020, the Dallas County

Judge Clay Jenkins issued a stay-at-home order similar to the New York Stay-at-Home Order

(the "Dallas Stay-at-Home Order") intended to stem the spread of the pandemic.   The Dallas

Stay-at-Home Order directed all non-essential businesses to cease operations—shuttering brick-

and-mortar venues and requiring the cancellation of all performances in those venues.  Like

many government officials across the country, including Mayor de Blasio, Judge Jenkins

explained that these drastic measures were needed because of the unique characteristics of the

novel coronavirus and, of particular relevance here, stated that "the COVID-19 virus causes

property loss or damage due to its ability to attach to surfaces for prolonged periods of time . . .

9

." Dallas was also subject to various bans on large gatherings at the city, county, and state level (the "Dallas Gathering Orders").  Likewise, the other cities, counties, and states where JGO's premises and dependent venues are located issued bans on large gatherings, stay-at-home orders, or both.[7]

28.     Some of the state, county, and city orders referenced above specifically stated that they were being issued because the virus had caused, causes, or will cause physical loss or damage to property.

29.     As the pandemic has evolved, the Orders have been renewed and amended by such authorities and continue to impose severe restrictions on large gatherings and non-essential businesses and operations.

30.     As the pandemic has evolved, the Orders have been renewed and amended by such authorities and continue to impose severe restrictions on all non-essential businesses and operations.  In late 2020 and early 2021, as coronavirus cases continued to increase throughout the United States, cities and states that had lifted Orders or loosened restrictions entered a

_____

[7] Bans on large gatherings were issued covering Albuquerque, New Mexico; Appleton, Wisconsin; Atlanta, Georgia; Austin, Texas; Baltimore, Maryland; Boston, Massachusetts; Calgary, Alberta, Canada; Cincinnati, Ohio; Columbus, Ohio; Costa Mesa, California; Dallas, Texas; East Lansing, Michigan; Edmonton, Alberta, Canada; Fort Lauderdale, Florida; Fresno, California; Grand Rapids, Michigan; Indianapolis, Indiana; Jacksonville, Florida; Kansas City, Missouri; Madison, Wisconsin; Miami, Florida; Milwaukee, Wisconsin; Montreal, Quebec, Canada; New Orleans, Louisiana; New York, New York; Omaha, Nebraska; Orlando, Florida; Ottawa, Ontario; Pittsburg, Pennsylvania; Portland, Oregon; Salt Lake City, Utah; San Antonio, Texas; Seattle, Washington; Vancouver, British Columbia, Canada.  Stay-at-home orders were issued covering Albuquerque, New Mexico; Appleton, Wisconsin; Atlanta, Georgia; Austin, Texas; Baltimore, Maryland; Boise, Idaho; Boston, Massachusetts; Cincinnati, Ohio; Columbus, Ohio; Costa Mesa, California; Dallas, Texas; East Lansing, Michigan; Fort Lauderdale, Florida; Fresno, California; Grand Rapids, Michigan; Houston, Texas; Indianapolis, Indiana; Jacksonville, Florida; Kansas City, Missouri; Louisville, Kentucky; Madison, Wisconsin; Miami, Florida; Milwaukee, Wisconsin; Monterrey, Mexico; New Orleans, Louisiana; New York, New York; Omaha, Nebraska; Orlando, Florida; Pittsburgh, Pennsylvania; Portland, Oregon; Salt Lake City, Utah; San Antonio, Texas; Seattle, Washington; and Tempe, Arizona.

"second wave" of lockdowns.  Renewed restrictions were applied throughout states where JGO does business and has insured premises, including New York, Massachusetts, Maryland, and Minnesota.

31.      The coronavirus is ubiquitous—it has spread throughout all fifty states, some individuals carry it with no symptoms, it cannot be visibly detected on surfaces and can remain on surfaces for weeks.  Indeed, JGO has had multiple confirmed cases of COVID-19 at and near its premises and dependent venues during the relevant period.  For example, individuals in New York City tested positive for COVID-19 after having worked in the theaters for shows to which JGO sells tickets—theaters located within and near Times Square and in close proximity to JGO's corporate offices.[8]  Additionally, on March 26, 2020, JGO was notified that a cast member of a theater performance at its Ottawa dependent venue from March 10-12, 2020, tested positive for COVID-19.  Similarly, on March 19, 2020, JGO was notified that a guest attending the March 12, 2020 performance at its Miami dependent venue tested positive for COVID-19.[9]

32.      New York City's Times Square, near JGO's corporate offices and the center of JGO's Broadway ticket sales, has seen confirmed cases throughout the pandemic.  The

---

[8] *See* Ryan McPhee, *Broadway Usher Tests Positive for COVID-19*, PLAYBILL (Mar. 11, 2020), *available at* https://www.playbill.com/article/broadway-usher-tests-positive-for-covid-19 (last visited Mar. 1, 2021); Playbill Staff, *Here Are the Members of the Broadway Community Who Have Tested Positive for COVID-19*, PLAYBILL (Apr. 3, 2020), *available at* https://www.playbill.com/article/here-are-the-members-of-the-broadway-community-who-have-tested-positive-for-covid-19 (last visited Mar. 1, 2021).
[9] *See Arsht Center Says Guest at March 12 Hamilton Show Tested Positive for COVID-19*, NBC Miami (March 20, 2020 7:07 AM), *available at* https://www.nbcmiami.com/news/local/arsht-center-says-guest-at-march-12-hamilton-show-tested-positive-for-covid-19/2208475/ (last visited Mar. 1, 2021).

Broadway production of *Moulin Rouge!* was the hardest-hit cast, with at least 25 cast members eventually testing positive for COVID-19.[10]

33.     From the outbreak of the pandemic, JGO's premises were uniquely vulnerable to the physical damage the virus causes, as large indoor group gatherings are among the highest-risk activities for potential COVID-19 exposure.  Given the countless audience members, staff, and performers entering and spending extended periods of time in theater spaces, and the confirmed COVID-19 cases at JGO's premises prior to the closure Orders, it is statistically certain that the virus has been present at all of JGO's premises and dependent venues for some period of time since the COVID-19 outbreak began.

34.     Due to the lack of widespread testing in the United States during the early months of the pandemic, and continued hurdles to testing even now, upon information and belief the virus and/or its resulting disease were significantly present at JGO's premises and dependent venues (and/or nearby properties).

### III.     JGO's Direct Physical Losses and Damage

35.     Among other services, JGO provides sales and advertising across North America for Broadway and Off Broadway shows, including in the home of Broadway and the theatre capital of the world—New York City.  JGO also owns and/or operates five performance venues in Baltimore, Boston, and Minneapolis that present a wide variety of entertainment including Broadway, concerts, comedy, dance and other live entertainment events.  JGO prides itself on the range of services it provides to the Broadway world and the ease with which its customers can obtain tickets—whether via subscription, individual tickets, or group packages—to the shows in

---

[10] *See* Michael Paulson, *'Moulin Rouge! Was Their Ticket. Then 2020 Happened.*, NEW YORK TIMES (Jan. 21, 2021), available at https://www.nytimes.com/2021/01/21/theater/moulin-rouge-broadway-coronavirus.html (last visited Mar. 1, 2021).

greatest demand, no matter if they are seeing a show on Broadway or a touring company in their hometowns.  Its business model, of course, depends on there being performances for which JGO advertises and sells tickets.

36.     The coronavirus pandemic, the direct physical loss and damage to JGO's premises and dependent venues (as well other properties in the vicinity) caused by the coronavirus, and the resultant Orders have had a devastating effect on JGO's business.  Before the pandemic, JGO's family of companies and owned and operated venues were the preeminent places for presenting, advertising and/or selling tickets to the hottest shows in the theatre world such as *Hamilton: An American Musical*; *The Book of Mormon; West Side Story*; *Hadestown*; *Moulin Rouge!*; *Come From Away*; *Dear Evan Hansen; The Lion King*; *Frozen*; *Wicked*; *The Blue Man Group*—but now, due to the pandemic, the physical loss and damage to property and the resultant shutdown Orders, live theater performances have been prohibited, forcing producers to cancel performances and, in some cases, cancel the entire run of the show.

37.     Pre-pandemic, JGO's operations brought in more than $1 billion in annual gross revenue.  But access to theaters has been prohibited by the Orders and the pandemic, and thus theater productions and ticket sales stopped overnight.

38.     As a result, JGO has suffered, and will continue to suffer, significant business interruption losses.

39.     These losses result from direct physical loss or damage to property, including, but not necessarily limited to, the actual and/or threatened presence of the virus at JGO's premises and dependent venues (and/or nearby properties) and the loss of function, purpose, and use of the properties—all caused by the virus, the resulting disease, the pandemic, and the resultant Orders.

IV.     **The Federal Policy**

40.     As it had done for numerous years prior, in exchange for a substantial premium, Federal sold the Policy covering JGO as the Named Insured for the Policy Period July 1, 2019 to July 1, 2020. *See* Ex. A, p. 1[11]. The Policy provides various per-**occurrence**[12] limits of liability based on the premises involved and the specific coverage being sought, a general per-**occurrence** Deductible of $50,000, a Waiting Period of 24 hours, and an unlimited Extended Period. *See id.* at pp. 21-26.

41.     The Policy's Business Income With Extra Expense coverage provides that Federal "will pay for the actual: **business income**[13] loss [JGO] incur[s] due to the actual impairment of [JGO's] **operations**[14]; and **extra expense**[15] [JGO] incur[s] due to the actual or potential impairment of [JGO's] **operations**, during the **period of restoration**[16], not to exceed the

---

[11] All citations to the Policy refer to the PDF page numbers.

[12] **Occurrence** is defined as "one event; or a series of causally related events that: a. contribute concurrently to; or b. contribute in any sequence to, the loss or damage." *Id.* at p. 144.

[13] **Business income** is defined as "A. net profit or loss . . . that would have been earned or incurred before income taxes [and] B. [JGO's] continuing normal: 1. operating; and 2. payroll, expenses . . . ." *Id.* at p. 136.

[14] **Operations** means JGO's "business activities occurring at [JGO's] premises . . . prior to the loss or damage." *Id.* at p. 145.

[15] **Extra expense** is defined as "necessary expenses [JGO] incur[s]: A. in an attempt to continue **operations**, over and above the expenses [JGO] would have normally incurred; and B. to repair and replace any **property**, . . . . if such action will reduce any loss [Federal] would pay under this insurance." *Id.* at p. 139.

[16] **Period of restoration** means "the period of time that, for **business income** [and **extra expense**], begins: A. immediately after the time of direct physical loss or damage by a **covered peril** to **property** . . . . **Period of restoration** will continue until [JGO's] **operations** are restored, with reasonable speed, to the level which would generate the **business income** amount that would have existed if no direct physical loss or damage occurred . . . not to exceed the applicable number of days shown as Extended Period in the Declarations, beginning on the date

14

applicable Limit Of Insurance for Business Income With Extra Expense shown in the Declarations." *Id.* at p. 68.  The Policy provides that "[t]he Limit Of Insurance for Dependent Business Premises applies:  . . . separately to each **occurrence**, regardless of the number of **dependent business premises**[17] that sustain covered direct physical loss or damage . . . provided that actual loss for such premises is the direct result of direct physical loss or damage, by a **covered peril**[18], to the **dependent business premises**." *Id.* at p. 35.

42.    The Policy's Declarations identifies the premises covered by the Policy and per occurrence Limits Of Insurance for each of JGO's relevant premises and dependent venues.  *Id.* at pp. 21-26.

43.    The Policy's Business Income With Extra Expense coverage provides that, except for certain sub-coverages, any "direct physical loss or damage must: be caused by or result from a **covered peril**; and occur at, or within 1,000 feet of, the premises, other than a **dependent business premises**, shown in the Declarations." *Id.* at p. 68.

44.    The Policy does not define the phrase "direct physical loss or damage."

45.    Direct physical loss or damage to property includes situations where a **covered peril** threatens property or renders property unusable or unsuitable for its intended purpose or unsafe for normal human occupancy or continued use.

---

that . . . the lost or damaged **property** is actually repaired or replaced and [JGO's] **operations** are restored.  The expiration of this policy will not cut short the **period of restoration**." *Id.* at pp. 146-47.

[17] **Dependent business premises** is defined as "premises operated by others on whom you depend to:  . . . attract customers to your business (leader premises)." *Id.* at p. 137.

[18] **Covered peril** is defined as "a peril covered by the Form(s) shown in the Property Insurance Schedule Of Forms, except Care, Custody Or Control Legal Liability, applicable to the lost or damaged **property**." *Id.* at p. 137.  **Property** in turn is defined, in relevant part, as "**building.**" *Id.* at p. 151.

46.     Relevant here, the Policy's Business Income With Extra Expense coverage

includes certain "Additional Coverages," including, Civil Authority coverage.  This coverage

provides:

[Federal] will pay for the actual:

- **business income** loss; or

- **extra expense**,

[JGO] incur[s] due to the actual impairment of [JGO's] **operations**, directly caused
by the prohibition of access to:

- [JGO's] premises; or

- a **dependent business premises**,

by a civil authority.

This prohibition of access by a civil authority must be the direct result of direct
physical loss or damage to property away from such premises or such **dependent
business premises** by a **covered peril**, provided such property is within:

- one mile; or

- the applicable miles shown in the Declarations,

from such premises or **dependent business premises**, whichever is greater.

The most [Federal] will pay for Civil Authority is the applicable Limit Of Insurance
for Business Income With Extra Expense shown in the Declarations.

The coverage for:

A.     **business income** will begin:

    1.     after the applicable waiting period shown in the Declarations for
Business Income expires; or

    2.     24 normal business hours following the time the civil authority
prohibits access,

whichever is the longer.

The Waiting Period shown in the Declarations will begin immediately following
the time the civil authority prohibits access.

The coverage will apply for a period of:

- up to 30 consecutive days after coverage begins; or
- when [JGO's] **business income** loss ends,

whichever occurs first; and

B. **extra expense** will begin immediately after the time the civil authority prohibits access and will end:

1. 30 consecutive days after the coverage begins; or

2. whenever [JGO's] **business income** coverage ends,

whichever is later.

*Id.* at pp. 70-71.

47. As pleaded above, JGO is entitled to coverage under the Business Income With Extra Expense coverage and/or Civil Authority coverage. JGO's premises and dependent venues (and/or nearby properties) have experienced direct physical loss or damage as a direct result of the virus, resulting disease, pandemic, and Orders, including, but not limited to, through the actual and/or threatened presence of the virus at JGO's premises and dependent venues (and/or nearby properties) and the loss of function, purpose, and use of the properties. Further, as a result of the Orders, access to JGO's premises and dependent venues has been prohibited, at a minimum, for its intended purpose.

48. None of the Policy's exclusions preclude JGO's claim for coverage nor does the Policy include any virus exclusion.

49. The JGO premises and dependent venues where JGO has sustained losses are listed as having Business Income With Extra Expense coverage in the Policy's Declarations. *See id.* at p. 21-26.

17

50.     JGO has paid all premiums due to Federal to purchase the Policy and has complied with all applicable duties under the Policy, including the duty to provide Federal a sworn proof of loss.[19]

**VI.     JGO's Claim to Federal**

51.     After some of JGO's premises and dependent venues were shuttered and access to them was denied, requiring the cancellation of performances, and JGO was notified of the presence of COVID-19-infected individuals at its premises and dependent venues, JGO gave prompt notice of its claim to Federal on March 24, 2020 and March 27, 2020.  On March 30, 2020, Federal responded to the notice with a reservation of rights letter.

52.     On May 11, 2020, JGO clarified with Federal that its previously submitted claim notices included all coronavirus-related business interruption/disruption losses at all of JGO's premises and dependent venues.  At that time, JGO provided a spreadsheet detailing the losses JGO had incurred prior to that date.  Federal acknowledged receipt of this communication that same day and noted that its investigation into JGO's claim was ongoing.

53.     JGO contacted Federal again on May 27, 2020 to request an extension of time to submit the sworn proof of loss required to be submitted under the Policy "within 90 days after the date of loss or damage." *Id.* at p. 127.  Federal responded on May 29, 2020 agreeing to extend JGO's time to submit a sworn proof of loss through August 30, 2020 while also requesting various information "for each insured premises involved in the claim."

54.     On July 7, 2020 in response to Federal's request for information, JGO provided a detailed spreadsheet listing the specific Orders relevant to each premise and dependent venue

---

[19] Federal expressly "acknowledge[d] that the proof of loss [provided by JGO] satisfies the policy requirements" in a letter to JGO dated September 10, 2020.

involved in the claim, as well as a description of why JGO is experiencing losses at that specific

location and noting instances where JGO was aware that infected persons had been confirmed to

be at the specific location.  In response, on July 13, 2020, Federal expressed appreciation for "the

detailed spreadsheet providing site-specific data pertaining to the multiple locations sustaining

impact as a result of the COVID-19 virus and the associated executive orders," but requested that

JGO "provide [Federal] with any indication of direct physical damage to any of the facilities

listed . . . ."

55.     JGO responded promptly on July 17, 2020, describing the ability of the virus to be

transmitted via surfaces and its highly contagious nature.  In this response, JGO provided a list

detailing the approximate number of confirmed COVID-19 cases to date in the vicinity of the

relevant premises and dependent venues—ranging from approximately 1,000 to 224,000 cases.

In addition to the confirmed cases of coronavirus at JGO's premises and dependent venues, JGO

explained that, given the widespread rate and speed of infection, and the nature of tourism,

particularly in some of JGO's larger markets like New York City, Atlanta, Boston, Miami/Fort

Lauderdale, Montreal, New Orleans, Orlando, and Seattle, it is statistically certain that the virus

had been present in JGO's premises and dependent venues or in the area surrounding those

locations.  JGO stated that it is JGO's position that every premise and dependent venue has

experienced direct physical loss or damage as a result of the presence of the virus in and/or

around the location.

56.     On July 21, 2020, Federal asked that JGO "state what was specifically damaged

or how it was actually damaged."  JGO once again promptly responded to Federal's request and

explained on July 24, 2020 that it is JGO's position that the presence of the virus in and/or

around the premises and dependent venues identified constitutes physical loss or damage—a

position supported by case law, as well as many of the Orders. JGO noted that certain of its premises and dependent venues had the presence of the virus at the location, but that JGO did not and could not test audience members, cast members, employees, or theater staff because such testing was not widely available prior to the mandatory closures of the theaters.

57.     Instead of honoring its obligations under the Policy, on July 31, 2020, Federal issued the Denial Letter, refusing to pay even a dollar of JGO's significant losses under any of the Policy's coverages.

58.     Despite Federal's failure to abide by the terms of the Policy, JGO continued to hold up its end of the bargain and submitted to Federal a sworn proof of loss on August 30, 2020. Via letter dated September 10, 2020, Federal "acknowledge[d] that the proof of loss satisfies the policy requirements," but "reaffirm[ed] [its] coverage position . . . ."

59.     Federal's position that JGO's losses are not covered by the Policy is erroneous. As pleaded, there has been direct physical loss or damage to property, including, but not necessarily limited to, the actual and/or threatened presence of the virus in JGO's premises and dependent venues and the loss of function and purpose of JGO's premises and dependent venues—all caused by the virus, the resulting disease, the pandemic and the resultant Orders. Further, unlike most other policies that were sold leading up to the pandemic, JGO purchased a Policy that does not contain a virus exclusion of any sort.

60.     The Denial Letter also argues that, with regard to the Civil Authority coverage, the Orders did not prohibit access to JGO's premises and dependent venues as the properties were still accessible for essential administrative duties. This position is likewise erroneous. The Policy does not define "prohibition of access" at all, much less to require a complete inability to access properties as Federal appears to contend. The more reasonable reading of that language

20

would require prohibition of access to the property for its intended purpose—here, the selling of tickets and advertising, the performing of shows, and access by members of the public holding tickets and wishing to attend those performances. Even if the Policy required complete prohibition of access to the properties, as Federal appears to contend, the Orders completely shuttered all non-essential businesses, including performance venues. Therefore, access to the performance venues (*i.e.*, non-essential business premises) was completely prohibited under the Orders. In fact, certain Orders explicitly required that non-essential businesses reduce the workforce present at the business properties to zero. Federal's insistence that the Orders did not truly prohibit access to JGO's premises and dependent venues is entirely irrational and is contrary to the facts.

61.     With Federal having taken the position that it will not provide the coverage required for JGO's losses, JGO turns to this Court to order Federal to pay the full extent of its coverage obligations under the Policy.

## FIRST CAUSE OF ACTION

(Breach of Contract)

62.     Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

63.     The Policy constitutes a valid and enforceable contract between JGO, as the "Named Insured," and Federal, as the "Company" providing the insurance, under the Policy.

64.     As described above, JGO has sustained, and continues to sustain, insured losses covered under the Policy.

65.     JGO provided prompt notice of its losses, performed all obligations required of it under the Policy at the time Federal denied coverage via letter dated July 31, 2020. The Denial

Letter was a clear expression that Federal would not perform its coverage obligations to JGO, in breach of the Policy.

66.    Under the terms of the Policy, Federal must pay up to the full limits for any loss covered under the Policy, per occurrence, subject only to any applicable sub-limits, time limits, waiting periods, or deductibles for specific coverages.

67.    Federal has not paid any amounts to JGO in connection with its claim and has refused to pay the full amount it is required to pay under the Policy for JGO's business interruption and/or civil authority losses.  Instead, Federal has asserted various inapplicable bases to wrongfully deny coverage for JGO's claim.

68.    As a direct and proximate result of Federal's breach of contract, JGO has suffered and will continue to suffer damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

## SECOND CAUSE OF ACTION

(Declaratory Judgment)

69.    Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

70.    Pursuant to the terms of the Policy, Federal is obligated to pay, up to the limit of liability or any applicable sub-limit, per occurrence, business interruption and/or civil authority losses covered under the Policy and not otherwise excluded from coverage.

71.    As detailed above, JGO's losses are covered under multiple coverages of the Policy and are not excluded from coverage.

72.    Federal disputes its legal obligation to pay JGO's claim.

73.    Pursuant to 28 U.S.C. § 2201, JGO is entitled to a declaration by this Court of Federal's obligations under the Policy.

74.     An actionable and justiciable controversy exists between JGO and Federal concerning the proper construction of the Policy, and the rights and obligations of the parties thereto, with respect to JGO's claim for expenses or losses arising out of the direct physical loss or damage arising from the pandemic and the resultant Orders.

75.     Pursuant to; 15, this Court should enter a declaratory judgment in favor of JGO and against Federal, declaring the following:

- JGO has experienced "direct physical loss or damage" to property, as that phrase is used in the Policy, sufficient to trigger coverage;

- Properties within a mile of JGO's premises and dependent venues have experienced "direct physical loss or damage," as that phrase is used in the Policy, sufficient to trigger coverage;

- There was "prohibition of access to [JGO's premises and dependent venues]" by the Orders, as that phrase is used in the Policy, sufficient to trigger coverage;

- Federal must pay JGO up to its limits of liability for all losses coverage under the Policy; and

- The award of such additional relief as the Court deems just and appropriate.

76.     A declaratory judgment would resolve or be useful to resolve this case or controversy.  JGO's losses are ongoing.  By clarifying the parties' rights and duties under the Policy, a declaratory judgment would guide Federal's treatment of JGO's covered, but yet unaccrued losses.  Because JGO also has unaccrued losses that have not yet ripened such that a coercive remedy like damages is appropriate, the declaratory judgment claim would afford JGO relief independent of the breach of contract claim.

## **PRAYER FOR RELIEF**

WHEREFORE, JGO prays for relief as follows:

(a)     On the First Cause of Action, JGO requests that the Court enter judgment against Federal, awarding JGO damages in an amount to be determined at trial, but not less than

$75,000, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

(b)      On the Second Cause of Action, JGO requests that the Court enter a declaratory judgment in favor of JGO against Federal that JGO's losses are covered under the Policy, declaring that Federal is required to pay JGO, up to the applicable limits of the Policy, for claimed amounts under the Policy;

(c)      For all Causes of Action, all pre-judgment and post-judgment interest as allowed by law and all JGO's costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees; and

(d)      JGO requests such other and further relief as the Court deems just and proper.

## JURY DEMAND

JGO hereby demands a trial by jury on all issues so triable.

Dated: New York, New York
      March 12, 2021

COHEN ZIFFER FRENCHMAN &
MCKENNA LLP

*/s/ Kenneth H. Frenchman*
Kenneth H. Frenchman
Meredith Elkins
1350 Avenue of the Americas
New York, New York 10019
Tel: (212) 584-1890
Fax: (212) 584-1891
kfrenchman@cohenziffer.com
melkins@cohenziffer.com

*Attorneys for The John Gore Organization, Inc.*