USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/8/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

THE JOHN GORE ORGANIZATION, INC.,

                                    Plaintiff,                          **REPORT & RECOMMENDATION**

          -against-                                                     **ON MOTION TO DISMISS**

                                                                        **21-CV-2200 (PGG) (KHP)**

FEDERAL INSURANCE COMPANY,

                                    Defendant.

-----------------------------------------------------------------

**TO:    THE HONORABLE PAUL G. GARDEPHE, United States District Judge**
**FROM: THE HONORABLE KATHARINE H. PARKER, United States Magistrate Judge**

Plaintiff The John Gore Organization, Inc. ("JGO") filed this action alleging breach of

contract and seeking a declaratory judgment that it is entitled to insurance coverage from its

insurer, Defendant Federal Insurance Company ("Federal").  Specifically, Plaintiff claims it is

entitled to coverage for business interruption losses incurred as a result of the COVID-19

pandemic and related governmental stay-at-home orders.  (ECF No. 1, Compl.)   Now before

the Court is Defendant's motion to dismiss the complaint for failure to state a claim pursuant to

Federal Rule of Civil Procedure 12(b)(6).  For the reasons explained below, I respectfully

recommend that Defendant's motion be granted.

## BACKGROUND[1]

JGO is a corporation that is the leading developer, producer, distributor, and marketer

of Broadway theater worldwide.  (Compl. ¶ 2.)  JGO is comprised of a family of companies and

---

[1] For purposes of the motion, the Court accepts well-pleaded factual allegations as true.

brands that are centered around New York City, and specifically, Broadway.  (*Id*.)  Among other services, JGO provides sales and advertising across North America for Broadway and Off-Broadway shows, and also operates performance venues and live entertainment events. (Compl. ¶ 35.)  JGO's specialty focus on Broadway theater, including, productions, ticketing and booking, made it particularly vulnerable to the novel coronavirus.  (*Id*. ¶ 3.)

In March 2020, many, if not all, of the state and local governments where JGO operates began banning large gatherings and implementing stay-at-home orders to stem the spread of the deadly coronavirus ("COVID-19").  (*Id*.)  Many of the shows in which JGO provides services were cancelled or postponed, forcing JGO to incur business losses.  (*Id*. ¶ 4.)  As the pandemic evolved, various state or nationwide orders[2] were renewed and/or amended and continued to impose severe restrictions on all non-essential businesses and operations forcing them to close. (*Id*.)  New York City Mayor Bill de Blasio explained that these drastic measures were needed because of the unique characteristics of the novel coronavirus and, of particular relevance here, "because the virus physically is causing property loss and damage[.]"  (*Id*. ¶ 3, 27.)

As a result, Plaintiff argues that the pandemic caused "direct physical loss or damage" to JGO's premises/ venues because COVID-19 is a virus that can be spread when "droplets from an infected person land on objects and surfaces, and then, after contact with the infected objects and surfaces, other individuals touch their eyes, nose, or mouth."  (*Id.* ¶ 17.)  Plaintiff further alleges that "though droplets carrying the virus are not visible, they are nonetheless physical objects, carrying a physical substance, that attach and cause harm to property."  (*Id*. ¶ 22.)

---

[2] The Court takes judicial notice of several executive orders given in New York. *See, e.g.*, *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411 (S.D.N.Y. 2011) ("[I]t is well-established that courts may take judicial notice of publicly available documents on a motion to dismiss.").

Plaintiff also claims that, given the countless audience members, staff, and performers entering and spending extended periods of time in theater spaces, "it is statistically certain that the virus has been present at all of [JGO's] premises and dependent venues for some period of time since the COVID-19 outbreak began." (*Id*. ¶ 33.)  As a result of the financial losses JGO incurred, JGO argues that it is entitled to coverage under its insurance policy with Defendant.  (*Id*. ¶ 47.)

**<u>INSURANCE POLICY</u>**

Prior to the pandemic, JGO purchased business interruption insurance from Federal. (Compl. ¶ 5.)  The policy at issue, the Customarq Series Entertainment Insurance Program policy (the "Policy" at ECF No. 1., Exh. A.), covers claims for the period of July 1, 2019 through July 1, 2020.  (*Id*. ¶¶ 5, 40.)  This "All Risk" Policy broadly provides coverage for the "actual impairment of [JGO's] operations" due to "direct physical loss or damage to property."  (*Id.* ¶¶ 41-46.)  JGO alleges that, among other things, the Policy provides coverage for: (i) loss resulting from the impairment of JGO's business activities; and (ii) loss caused by the prohibition of access to property – both JGO's Premises and its dependent venues – by a civil authority.  (*Id.)*

Plaintiff alleges that the Policy's Business Income With Extra Expense' coverage provides that Federal:

> "will pay for the actual: business income loss [JGO] incur[s] due to the actual impairment of [JGO's] operations; and extra expense [JGO] incur[s] due to the actual or potential impairment of [JGO's] operations, during the period of restoration, not to exceed the applicable Limit of Insurance for Business Income With Extra Expense shown in the Declarations."

(Ex. A, p. 68.)  The Policy further provides that:

"[t]he Limit of Insurance for Dependent Business Premises applies: . . . separately to each occurrence, regardless of the number of dependent business premises that sustain covered direct physical loss or damage . . . provided that actual loss for such premises is the *direct result of direct physical loss or damage*, by a covered peril, to the dependent business premises."

 (*Id*. p. 35.)

The policy also includes so-called "civil authority" coverage.  This is a special type of business income and extra expense coverage triggered by certain governmental actions.  In relevant part, the policy provides coverage for: "business income loss; or extra expense, [JGO] incur[s] due to the actual impairment of [JGO's] operations, directly caused by the prohibition of access to: [JGO's] premises; or a dependent business premises, by a civil authority."  (*Id*. ¶ 46.)  The Policy provides that this prohibition of access by a civil authority must be the "direct result" of "*direct physical loss or damage* to property away from such premises or such dependent business premises[.]"

Importantly, the Policy does not define the phrase "direct physical loss or damage;" nor does it contain a virus, pandemic, or public health exclusion.  (*Id.* ¶¶ 5, 44, 49.)  Accordingly, Plaintiff alleges in the Complaint that "direct physical loss or damage to property includes situations where a "covered peril" threatens property or renders property unusable or unsuitable for its intended purpose or unsafe for normal human occupancy or continued use." (*Id*. ¶ 45.)

Relying on their policy, JGO submitted two insurance claims to Federal on March 24, 2020 and March 27, 2020.  (*Id*. ¶ 51.)  On July 31, 2020, Federal denied coverage stating, among

4

many reasons, that there was no "particular physical loss or damage either at [JGO's] premises or within any specific geographical range of [JGO's] premises." (*Id*. ¶¶ 8, 57.)

## LEGAL STANDARD

### I.       Failure to State a Claim

When considering a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all inferences in the Plaintiff's favor. *Cruz v. Beto*, 405 U.S. 319, 322 (1972); *Littlejohn v. City of New York*, 795 F.3d 297, 306-07 (2d Cir. 2015). To survive a motion to dismiss, the complaint must contain "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While detailed factual allegations are not required, the complaint must contain more than mere "labels and conclusions." *Iqbal*, 556 U.S. at 678. It must contain more than "naked assertion[s] devoid of further factual enhancement." *Id.* (internal citation and quotation marks omitted). And, it must contain more than a "formulaic recitation of the elements of a cause of action." *Id.* As the Supreme Court explained in *Iqbal*, the "plausibility standard" asks for "more than a sheer possibility that a defendant has acted unlawfully." *Id.* When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint – such as the insurance policy applicable here. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002).

When a motion to dismiss is granted, the usual practice is to dismiss the claims without prejudice and grant a plaintiff leave to amend the complaint. *Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) (per curiam); *see also* Fed. R. Civ. P. 15(a)(2) ("[t]he court should freely

give leave [to amend] when justice so requires").  Leave to amend should be granted unless there is evidence of undue delay, bad faith, undue prejudice, or futility.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

## II.    <u>Choice of Law</u>

Federal courts sitting in diversity apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 498 (1941).  In contract disputes, New York courts apply a "center of gravity" approach in which courts may "consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties."  *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 135 (2d Cir. 2018) (quoting *Brink's Ltd.*, 93 F.3d at 1030-31).  "In the insurance context, courts typically apply the law of the state which the parties understood was to be the principal location of the insured risk."  *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.,* 36 A.D.3d 17, 24, 27 (N.Y. App. Div. 2006), *aff'd,* 9 N.Y.3d 928, 844 N.Y.S.2d 773, 876 N.E.2d 500 (2007)

Here, the Plaintiff is a corporation organized under the laws of Delaware, with its principal place of business in New York; and the Defendant is an insurance corporation organized under the laws of Indiana with its principal place of business in Indiana.  (Compl. ¶¶ 11, 12.)  For purposes of choice of law rules in the insurance context, Plaintiff's principal place of business, the named insured's mailing address, and the named insured's producer and servicing officer is in New York.  (Compl. Ex. A at p. 15.)  Accordingly, the principal location of insured risk under the Policy is New York, and the parties agree that New York law governs the interpretation of the terms and conditions of the Federal Policy.

### III.    Standards Applicable to Insurance Policies

Under New York law, "insurance policies are interpreted according to general rules of contract interpretation." *Olin Corp. v. Am. Home Assurance Co.,* 704 F.3d 89, 98 (2d Cir. 2012). Courts must "give effect to the intent of the parties as expressed in the clear language of their contract." *Ment Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co.,* 702 F.3d 118, 122 (2d Cir. 2012). The insured party "bears the burden of showing that the insurance contract covers the loss." *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.,* 225 F.3d 270, 276 (2d Cir. 2000).

The initial interpretation of a contract and whether its terms are ambiguous are questions of law for the Court to decide. *See Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006). Where contract terms are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business," the contract terms are ambiguous. *Olin*, 704 F.3d at 99. "[A]ny ambiguity must be resolved in favor of the insured and against the insurer." *Parks Real Estate*, 472 F.3d at 42.

On the other hand, policy terms are unambiguous where they provide "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Olin*, 704 F.3d at 99. "If a contract is unambiguous, courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 573 (2d Cir. 1993); *accord Int'l Multifoods Corp. v. Com. Union Ins. Co.,* 309 F.3d 76, 83 (2d Cir. 2002); *W.W.W. Assocs., Inc. v. Giancontieri*,

77 N.Y.2d 157 (1990). Contractual language "whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010). Instead, each party's interpretation must be reasonable for the court to find ambiguity. *Id.* An interpretation is not reasonable if it strains the policy language "beyond its reasonable and ordinary meaning." *Id.* (citing *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456 (1957)).

## DISCUSSION

### I.    Breach of Contract

The parties do not dispute that there is an enforceable contract, nor that JGO suffered losses. The dispute is whether the allegations of the "ubiquitous" presence of COVID-19 droplets on and in and around its property constitutes "direct physical loss or damage" to property sufficient to trigger coverage. On a Rule 12 motion, the Court must accept the allegations in the complaint as true. Thus, the Court accepts that COVID-19 droplets were present in the air at Plaintiff's facilities or covered facilities at least for some period of time. The Court also accepts that COVID-19 can be transmitted by touching a contaminated surface and then, without washing hands, touching one's eyes, nose or mouth. And, it goes without saying that COVID-19 is a dangerous virus that can cause death.

Even assuming all of these things are true, the question is whether the Plaintiff has plausibly alleged that the presence of COVID-19 droplets caused "direct physical loss or damage" to the Plaintiff's property, dependent property or nearby property. On a motion to dismiss, the Court evaluates whether the allegations of direct physical loss or damage are

plausible; that is, more than a sheer possibility that there was "direct physical loss or damage" within the meaning of the insurance policy.

The phrase and terms within the phrase "direct physical loss or damage" are not defined in the insurance policy.  Thus, the terms are given their ordinary meaning.  *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011).  The seminal case in New York discussing the meaning of these terms is *Roundabout Theater.*  In *Roundabout Theater Co. v. Continental Casualty Co.*, a major construction accident occurred on the street outside a theater at which a popular musical was being staged.  *Roundabout Theatre Co. v. Cont'l Cas. Co.,* 751 N.Y.S.2d 4 (2002).  As a result of this accident, the City of New York closed the street.  *Id.*  The theater itself did not suffer any damage, but it was forced to cancel nearly three dozen performances of a musical because the street was inaccessible to the public for several weeks.  *Id.*  The theater claimed business interruption losses; the insurer denied coverage; and the theater sued.  *Id.* at 5-6.  The policy at issue in *Roundabout Theater* provided coverage for "loss of, damage to, or destruction of property or facilities . . . contracted by the insured for use in connection with such [p]roduction, caused by the perils insured against," and defined perils as "all risks of direct physical loss or damage to the [theater's] property."  *Id.* at 8.  Reading these provisions together, the Appellate Division held that the policy "clearly and unambiguously provide[d] coverage only where the insured's property suffers direct physical damage" and, thus, "the only conclusion that can be drawn is that the business interruption coverage is limited to losses involving physical damage to the insured's property."  *Id.*

The theater argued that denying coverage would render the term "loss of" redundant to the term "destruction of."  The Court rejected this argument insofar as "loss of" could refer to

9

theft or misplacement of property that is neither damaged nor destroyed.  *Id.*  It also held that the plain meaning of the words "direct" and "physical" narrowed the scope of coverage to situations where the covered property was impacted.  *Id*.  The Court also found that its interpretation was consistent with other provisions of the policy including a provision measuring the recovery to "such length of time as would be required . . . to rebuild, repair or replace such part of the property . . . lost, damaged or destroyed."  *Id*. at 8.   Therefore, because the theater did not suffer physical damage, it was not entitled to coverage.  *Id.* at 10.

The Court in *Newman Myers* affirmed the reasoning in *Roundabout* as to the meaning of "direct physical loss or damage."   *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 325 (S.D.N.Y. 2014).  In *Newman Myers*, the Court held that the preemptive utility shut-off to commercial buildings in preparation for a hurricane did not constitute "direct physical loss or damage" to the insured's property and thus coverage was not triggered. *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 327, n. 4 (S.D.N.Y. 2014) (explaining that New York law applies).  The district court reasoned that "the words 'direct' and 'physical,' which modify the phrase 'loss or damage,' ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure."  *Id.* at 331 (citing *Roundabout Theatre Co.* 751 N.Y.S.2d at 8 and Couch on Insurance, § 148:46 (3rd ed.2009)) (defining "physical loss" as a requirement which is "widely held to exclude alleged losses that are intangible or incorporeal") and § 167:15 ("business interruption policies generally require some physical damage to the insured's business in order to invoke coverage").  It held that the cases cited by the Plaintiff

10

involving situations of a nearby rockfall, gas leak, a contaminated well, and a noxious odor, all from outside of New York, were distinguishable because "in each there was some compromise to the physical integrity of the workplace." *Id*. at 330.  It further stated that "[w]hether or not these cases were correctly decided, each involved the closure of a building due to either a physical change for the worse in the premises or a newly discovered risk to the []physical integrity." *Id*.  The Court reiterated that *Roundabout* stands for the proposition that the phrase "loss of" did not include "loss of use of" the premises because the words "direct" and "physical" precluded such an interpretation.  *Id*. at 331.

A recent New York trial court decision involving a similar claim for losses associated with COVID-19 closures similarly held that the policy in question, which required "direct physical loss or damage," foreclosed an argument that mere loss of use of the property based on the presence of the virus in and on the property.  *Visconti Bus Serv., LLC v. Utica Nat'l Ins. Grp*., 71 Misc.3d 516, 142 N.Y.S.3d 903 (2021).  Indeed, the majority of cases in New York have found that presence of the virus and shutdown orders aimed at preventing the spread of the virus do not trigger coverage under policies requiring "direct physical loss or damage" to property.  *See, e.g., Northwell Health, Inc. v. Lexington Ins. Co*., 21-cv-1104, 2021 WL 3139991, at *6 (S.D.N.Y. July 26, 2021); *Soundview Cinemas Inc. v. Great Am. Ins. Grp*., 142 N.Y.S.3d 724, 735 (N.Y. Sup. Ct. 2021) (acknowledging majority view that loss of use of the premises does not constitute direct physical loss or damage); *Kim-Chee LLC v. Philadelphia Ind. Ins. Co*., 20-cv-1136, 2021 WL 1600831 (W.D.N.Y. Apr. 23, 2021) (collecting cases finding that closure of business due to suspected presence of COVID-19 virus or due to New York State executive orders do not qualify as direct physical loss or damage); *Torches on the Hudson v. The Sentinel Ins. Co. Ltd.*, 20-cv-

7855 (S.D.N.Y. Nov. 18, 2021) (collecting cases following Roundabout's interpretation of the meaning of "direct physical loss or damage").[3]

Like the policies in the above-mentioned cases, the policy here provides coverage for actual losses due to actual or potential "impairment of operations" due to "direct physical loss or damage to property."   (Compl. ¶¶ 41-46)  A plain reading of "physical loss" connotes a destruction or elimination of property, whereas "physical damage" connotes tangible harm to property.[4]  Indeed, the ordinary meaning of "physical" is "having material existence" and being "perceptible especially through the senses;" that is, tangible—able to be easily seen or recognized. *See* "physical." *Merriam-Webster.com,* 2011. https://www.merriam-webster.com (8 December 2021.)  This reading is also consistent with other provisions of the insurance policy that state that "lost or damaged covered property will be valued at the cost to repair or replace," (ECF No. 1, Exh. A. p. 59) and defining a "Period of Restoration" as including the time required to "repair or replace" the property.  (ECF No. 1, Exh. A. pp. 147-148.)  An ordinary meaning of "repair" is to put together what is broken or restore to a sound state.  *See* "repair."

---

[3] *Kingray Inc. v. Farmers Group Inc.,* No. EDCV 20-963, 2021 WL 837622 (C.D. Cal. Mar. 4, 2021), cited by Plaintiff, is an outlier case that this Court declines to follow.  The Court in *Kingray* accepted the possibility that physical loss could mean loss of use insofar as the claimant was "dispossessed" of use by virtue of the stay-at-home order and that any other reading would render the inclusion of "or damage" redundant.  The Court did not mention the *Roundabout Theater* case in its analysis or other New York cases interpreting the meaning of "direct physical loss or damage" to require some physical change or risk to physical integrity.  Nor did it explain how its reading would not render the words "direct" and "physical" meaningless. *See Deer Mountain LLC, et al. v. Union Ins. Co.*, No. 120CV0984BKSDJS, 2021 WL 2076218 (N.D.N.Y. May 24, 2021) (rejecting *Kingray's* interpretation and its application of New York law without addressing *Roundabout*, *Newman Myers*, or any of the foregoing COVID-19 cases).

[4] *See, e.g. DeMoura v. Cont'l Cas. Co.,* No. 20-CV-2912 (NGG) (SIL), 2021 WL 848840, at *6 (E.D.N.Y. Mar. 5, 2021) ("[i]t is clear that "direct physical loss [of] damage to property" requires actual, *tangible* harm to the property."); *ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO, FERRARA, WOLF & CARONE, LLP, v. VALLEY FORGE INSURANCE COMPANY & CNA FINANCIAL CORPORATION,* No. 20-CV-2941 (LDH)(LB), 2021 WL 5759703, at *5 (E.D.N.Y. Dec. 3, 2021) (Ultimately, this Court joins the other cases in the Southern District of New York in finding the plain language of the Policy requires *tangible* harm to the property.)

*Merriam-Webster.com*, 2011. https://www.merriam-webster.com (8 December 2021.)    In

other words, the policy as a whole discusses replacement for losses of property and repair of

damage to property—which is contrary to Plaintiff's suggestion that "loss" also includes loss of

use.   Further bolstering the Court's interpretation of the plain meaning of "direct physical loss

or damage" to property, the policy also states that it does not cover loss or damage that results

from "loss of market, loss of use or delay."  (ECF No. 1, Exh. A p. 64.)

The presence of COVID-19 droplets or particles in the air and on surfaces does not result

in a loss of property requiring replacement of property; nor does it damage property requiring

repair as contemplated in the policy.  While the Court is mindful that it must accept well-

pleaded factual allegations in the Complaint as true, merely alleging that the droplets "caused

physical loss or damage" by being present on surfaces is insufficient.  The allegations in the

Complaint do not describe the nature of the physical damage or loss to property.  At oral

argument, Plaintiff conceded that COVID-19 particles were in other buildings where people

were present, such as hospitals, yet no physical repairs or reconstruction of property were

required.  The difference, they argued, is that theaters are uniquely impacted.  Not so.

Theaters have been uniquely impacted not because of the damage from COVID-19 to the

physical structures, but instead because they are places where people gather and can infect

each other – gatherings deemed non-essential by government officials attempting to mitigate

the spread of COVID-19.  Neither the presence of the droplets in the air or on surfaces caused a

physical loss or damage to relevant property here; rather, they posed a risk to people who

entered the property, especially if those people did not take safety precautions such as washing

hands and wearing a mask.  Plaintiff's allegations recognize this, describing the danger as one to

humans insofar as COVID-19 is a deadly disease.  In this regard, it is notable that Plaintiff's

policy states it will not pay for extra expense caused by or resulting from any sickness or disease

of any person—further underscoring that losses from humans breathing out COVID-19 particles

are not covered.  (ECF No. 1., Exh. A p. 104.)

Plaintiff cites to a number of cases decided under other states' laws to support the

argument that contaminants render an insured's premises unusable or uninhabitable and are

sufficient to plead "direct physical loss or damage" to property.   However, this Court declines

to adopt their reasoning and instead follows the well-established New York case law

interpreting this language.  To the extent Plaintiff relies on *Port Auth. Of N.Y. & N.J. v. Affiliated

FM Ins. Co.*,[5] 311 F.3d 226, 236 (3d Cir. 2002), decided under New York and New Jersey law just

weeks before the Appellate Division issued its decision in *Roundabout Theater*, its reliance is

misplaced.  The Court in that case recognized that physical damage to property means a

"distinct, demonstrable, and physical alteration" of its structure.  *Id*. at 235.  It recognized that

that invisible physical damage to a building is possible, but stated it "must meet a higher

threshold," giving an example of a situation when a building is closed due to gasoline fumes

---

[5] In *Port Auth. Of N.Y. & N.J. v. Affiliated FM Ins. Co.*, the court considered whether the presence of asbestos at levels below the threshold considered unsafe by the EPA constituted "physical loss or damage" under a property insurance policy.  311 F.3d 226, 236 (3d Cir. 2002).  *Id*. at 231-32.  In a matter of first impression under New York and New Jersey law, the Third Circuit held that an insured suffers a loss when the structure is rendered uninhabitable and unusable by large quantities of asbestos in the air, or there is a threat of imminent release in such dangerous quantities.  *Id*. at 236.  "The mere presence of asbestos, or the general threat of future damage from that presence, lacks the distinct and demonstrable character necessary for first-party insurance coverage." *Id.*  The Third Circuit ultimately affirmed summary judgment in favor of the insurer because the buildings' functions were not "nearly eliminated or destroyed," but rather enjoyed "continuous and uninterrupted usage."  *Id.* at 236.  Thus, this case only further bolsters dismissal here because Plaintiff fails to argue that its theaters/premises were "nearly eliminated or destroyed" because of the presence of COVID-19.

seeping into a building's structure making it unsafe and eliminating its function.[6]  *Id*.  It

ultimately held that while asbestos contamination could in some circumstances constitute a

physical loss or damage, the contamination had to be in such quantity to be comparable to that

of fire, water or smoke on a structure's use and function.  *Id*. at 236.  Because the asbestos

contamination in question was contained within the structure and not an imminent threat to

persons, it found that the policy did not cover it because it did not cause a physical loss or

damage to the structure.  *Id*.   Thus, this case only further bolsters dismissal here insofar as

Plaintiffs do not plead any facts to suggest that COVID-19 droplets are comparable to damage

done by fire, water or smoke.

In *Kim-Chee LLC v. Philadelphia Ind. Ins. Co*., the Court similarly reasoned that the

presence of COVID-19 particles and droplets does not alter property in such a way as to

constitute a "direct physical loss or damage" in the way radiation, chemical dust and gas, or

asbestos might.  *Kim-Chee LLC v. Philadelphia Ind. Ins. Co*., 20-cv-1136, 2021 WL 1600831

(W.D.N.Y. Apr. 23, 2021).  It stated that the virus does not "alter the characteristics of the

covered property in any way" and that the "building itself remains unharmed" and that it

"would be safe for occupancy except for the arrival of people who bring new sources of

infection." *Id.* at *4.  The Court recognized that covered losses may not be confined to the

obvious physical changes to a building caused by fire or bad weather; yet it also recognized that

not all contaminants requiring clean-up are covered, characterizing these principles as "two

ends of a spectrum extending from the easily remedied intrusion of road dust and ending with

---

[6] In the case of gas fumes, there would presumably be a leaking or damaged pipe releasing the fumes.  In other words, the gas leak is tied to physical damage.

the persistent hazard of gasoline seepage." *Id*. at *5.  The Court stated, "[a]t one end, it is

obvious that no direct physical loss or damage has occurred.  The foreign substance is

temporary and does not prevent use of the structure.  At the other, few would question that

although the building is still standing, it has been rendered unusable because of the risk of fire

or explosion." *Id*.  Ultimately, the Court held that the loss was due to restrictions on "human

activities," not due to "direct physical loss or damage to the insured premises." *Id*.  The Court's

reasoning is persuasive.  A gas leak involves something particular to the insured's property,

presumably a leaky pipe, that jeopardizes its physical integrity (it could catch on fire or

explode).  In contrast, the presence of COVID-19 is not particular to the insured or its property.

Humans spread the virus.  Human actions, such as masking and washing hands and not

gathering with other potentially infected people, mitigate risk.  The virus damages humans, not

physical structures.  Plaintiffs' allegations that the virus is persistent and ubiquitous, and that it

had to provide hand sanitizing stations, plexiglass shields, and COVID-related signage, enhance

its HVAC system, and implement health screening and contact tracing measures, does not

change this reality.  Furthermore, hand sanitizing stations, plexiglass shields, COVID-related

signage and an enhanced HVAC system are not there to replace or repair damage to the

property, they are there to protect humans.

Plaintiff cannot fit a square peg in a round hole.  Plaintiff's conclusory allegation of

physical loss or damage is insufficient to withstand dismissal.

### a.  *Civil Authority*

Additionally, Plaintiff argues that it is entitled to coverage under the Policy's civil

authority provision because access to JGO's premises were prohibited by a civil authority and

the "prohibition of access by a civil authority was the direct result of physical loss or damage to property." (ECF No. 19 at p. 27.)

The Policy's Civil Authority provision is included under the additional coverages section of the Policy's Business income With Extra Expense coverage. (Compl. ¶ 46.) To trigger civil authority coverage, the provision requires Plaintiff to demonstrate that its losses were incurred due to the actual impairment of its operations" directly caused by the prohibition of access . . . by a civil authority" and the "prohibition of access by a civil authority must be the direct result of *direct physical loss or damage to property* away from such premises." (ECF No. 28 at p. 21.)

As a preliminary matter, Defendant contends that Plaintiff was not prohibited from accessing their premises. The Court agrees. With respect to the government shutdown Orders cited in Plaintiff's Complaint, other courts have found that "limiting access is distinct from prohibiting access, such as in a situation where an unsafe condition at an adjoining building would require a safety evacuation." *Sharde Harvey*, 2021 WL 1034259, at *13; *see also Food for Thought,* 2021 WL 860345 at *6 ("Food For thought's allegation that the civil authority orders prohibited access to its 'property for its intended purpose' is not enough to trigger the Civil Authority coverage provision . . . because no civil authority order denied complete access to plaintiff's premises, the Amended Complaint fails to allege that access was 'specifically prohibited.'") This Court agrees with the reasoning of these courts. While it is true that the government shutdown orders limited public access to Plaintiff's properties – there was no actual prohibition of access to its properties per se; that is, an individual employee could enter the premises, but the business was not permitted to operate to prevent people from traveling and gathering and thereby spreading the virus.

Further and in any event, and as discussed above, the Policy's civil authority provision is inapplicable because Plaintiff failed to plausibly allege the civil authority orders were the "direct result of direct physical loss or damage to property." The New York precedent mentioned above also supports a finding that Plaintiff's losses are not covered under the Policy's Civil Authority provision. *See, e.g., Visconti Bus Serv., LLC v. Utica Nat'l Ins. Grp.*, 142 N.Y.S.3d 903, 908 (N.Y. Sup. Ct. 2021) (". . . mere loss of use or functionality does not constitute a "direct physical loss" within the meaning of a policy providing coverage for "direct physical loss or damage" to covered property") (citing *Roundabout Theatre Co., Inc. v. Continental Cas. Co., supra* and *Newman Myers, supra*); *Soundview Cinemas Inc. v. Great Am. Ins. Grp.*, 142 N.Y.S.3d 724, 734-35 (N.Y. Sup. Ct. 2021); *Mangia Rest. Corp. v. Utica First Ins. Co.,* 148 N.Y.S.3d 606 (N.Y. Sup. Ct. 2021).

b. *Virus Exclusion*

Lastly, Plaintiff argues that the absence of a virus exclusion is significant because if a virus could never cause direct physical loss or damage, then no such exclusion would be necessary. (ECF No. 19 at p. 30.) This argument attempts to redirect the focus of the Court's analysis from the plain meaning of the coverage provisions to speculation about what parole evidence might show about negotiation of the contract. Applicable law requires the Court to first assess the meaning of the actual language of the policy and, absent ambiguity in the language, precludes consideration of parole evidence about potential exclusions that could have been added. Further, if the allegations of the Complaint do not trigger coverage under the plain meaning of the policy, there is no need to look at policy exclusions. *See Com. Union Ins. Co. v. Flagship Marine Servs., Inc.,* 190 F.3d 26, 33 (2d Cir. 1999) (the absence of an exclusion

18

cannot create coverage) (citing, *Advance Watch Co. v. Kemper Nat'l Ins. Co.,* 99 F.3d 795, 805 (6th Cir. 1996 )("[T]he absence of an exclusion cannot create coverage; the words used in the policy must themselves express an intention to provide coverage for liability for the kind of occurrence or injury alleged by the claimant."). Here, the language in the policy requiring direct physical loss or damage to property is unambiguous. Therefore, this argument is unavailing. See *Universal Am. Corp. v. Nat'l Union Fire Ins. Co.*, 25 N.Y.3d 675 (2015); *Kim-Chee LLC v. Philadelphia Indem. Ins. Co.,* No. 1:20-CV-1136, 2021 WL 1600831 (W.D.N.Y. Apr. 23, 2021) (holding Defendant's decision to forego the virus exclusion does not alter the limits the direct physical loss clause places on the coverage.)

## II.    Declaratory Judgment

Plaintiff's Complaint requests that the Court enter a declaratory judgment in favor of JGO finding that: (1) JGO has experienced "direct physical loss or damage" to property; (2) properties within a mile of JGO's premises and dependent venues have experienced "direct physical loss or damage; (3) there was "prohibition of access to JGO's premises and dependent venues" by the Orders; (4) Federal must pay JGO up to its limits of liability for all losses coverage under the Policy; and (5) the award of such additional relief as the Court deems just and appropriate. (Compl. ¶ 75.)

It is well-established that a request for a declaratory judgment must be dismissed if it is "merely duplicative of [a] [p]laintiff's breach of contract claim." *NRW Inc. v. Bindra*, No. 12-CV-8555, 2015 WL 3763852, at *3 (S.D.N.Y. June 16, 2015); *see also Optanix, Inc. v. Alorica Inc.*, No. 20-CV-9660, 2021 WL 2810060, at *3 (S.D.N.Y. July 6, 2021) ("Courts reject declaratory judgment claims 'when other claims in the suit will resolve the same issues,' because, under

19

such circumstances, a declaratory judgment will not serve any useful purpose." (citation omitted)).   Further, the "Declaratory Judgment Act does not provide independent claims.  Its operation is only procedure to form relief possible otherwise previously unavailable.  Therefore, a Court can only enter declaratory judgment in favor of someone who has a substantive claim." *Red Apple Dental, P.C. v. Sentinel Ins. Co. Ltd.,* No. 20CV3549, 2021 WL 4455056, at *5 (S.D.N.Y. June 11, 2021)

Here, it is clear that Plaintiff's requested relief is redundant of its contractual claim.  It merely seeks an interpretation of the policy consistent with its theory of coverage in its breach of contract action.  Said another way, if Plaintiff were to prevail on its breach of contract claim, the issue of coverage would necessarily be decided and no additional ruling would be required to clarify the issues.  *Broadview Chem. Corp. v. Loctite Corp*., 417 F.2d 998, 1001 (2d Cir. 1969) and *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.,* 411 F.3d 384, 389 (2d Cir. 2004), cited by Plaintiff, do not hold otherwise, as they addressed standing, not whether a declaratory judgment claim was redundant of a contract claim. *Broadview Chem. Corp.,* 417 F.2d at 1001 (Plaintiff sought declaratory judgment that it had not infringed two patents; issue was whether there was actual controversy for purposes of standing; parties disputed "amplitude" or scope of the patents in suit)*; Duane Reade*, 411 F.3d at 389 (district court had dismissed breach of contract claim as premature; issue presented concerned scope of coverage—the length of the "Restoration Period," not whether denial of coverage was a breach of contract, and whether there was an actual controversy ripe for adjudication).

In fact, many other courts in cases involving COVID-19 coverage claims like this one have dismissed declaratory judgment causes of action for being redundant of breach of contract

20

claims. *See, e.g., WM Bang LLC v. Travelers Cas. Ins. Co. of Am.,* No. 20-CV-4540 (KMK), 2021 WL 4150844, at *5 (S.D.N.Y. Sept. 13, 2021); *Tappo of Buffalo, LLC v. Erie Ins. Co.,* No. 20-CV-754V(SR), 2020 WL 7867553, at *2 (W.D.N.Y. Dec. 29, 2020) (The Court dismissed Plaintiff's declaratory judgment claim because it was duplicative of the breach of contract claim); *Broadway 104, LLC v. XL Ins. Am., Inc.,* No. 20-CV-3813 (PKC), 2021 WL 2581240, at *4 (S.D.N.Y. June 23, 2021) (The Court dismissed Plaintiff's breach of contract claim and claim for declaratory judgment because they were premised on the same allegedly improper denial of coverage.); *Food for Thought Caterers Corp. v. Sentinel Ins. Co., Ltd.,* 524 F. Supp. 3d 242 (S.D.N.Y. 2021) (The Court denied Insurers claim seeking declaratory judgment and damages for breach of contract arising from denial of its claims for coverage); *DeMoura v. Cont'l Cas. Co.,* 523 F. Supp. 3d 314, 317 (E.D.N.Y. 2021) (Court denied Plaintiff's request seeking declaratory judgment that commercial property policy covered business losses incurred due to shutdown orders during COVID-19 pandemic).

Accordingly, Plaintiffs' claim for declaratory judgment should also be dismissed.

### III.    Leave to Amend

Federal Rule of Civil Procedure 15(a) provides that leave to amend a deficient complaint should be freely given. Fed. R. Civ. P. 15(a)(2). However, the Court need not grant leave to amend where the proposed amendment would be "futile." *Id.* An amendment is deemed futile if it would fail to state a colorable claim under Federal Rule of Civil Procedure 12(b)(6). *See Rye Ridge Corp. v. Cincinnati Ins. Co.,* No. 20 CIV. 7132 (LGS), 2021 WL 1600475, at *4 (S.D.N.Y. Apr. 23, 2021); *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp.,* 783 F.3d 383, 389 (2d Cir. 2015); *Iqbal,* 556 U.S. at 678.

Plaintiff seeks leave to amend its Complaint because it argues it is capable of alleging additional facts to cure any deficiencies identified in the Complaint. (ECF No. 19. At p. 32, n. 13.) The Court assumes that had Plaintiffs been able to, they would have pleaded additional facts establishing physical loss or damage. Nevertheless, if Plaintiff has additional facts that it believes would cure the deficiencies identified in this recommendation, they should be granted leave to replead.

## CONCLUSION

For the reasons set forth above, I respectfully recommend that Defendant's motion to dismiss be GRANTED (ECF No. 27.) without prejudice to Plaintiff's right to amend the Complaint.

**SO ORDERED.**

Dated: December 8, 2021
New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge

## Notice

**The parties shall have fourteen days from the service of this Report and Recommendation to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)).**

**If any party files written objections to this Report and Recommendation, the opposing party may respond to the objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardephe at the United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Gardephe. The failure to file these timely**

objections will result in a waiver of those objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).