**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------------

|   |   |
|---|---|
| | :   Civil Action No. 1:21-cv-02200-JPG |
| THE JOHN GORE ORGANIZATION, INC., | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| FEDERAL INSURANCE COMPANY, | : |
| | : |
| Defendant. | : |
| | : |

-------------------------------------------------------------------------------

<u>**PLAINTIFF'S OBJECTIONS TO THE REPORT AND RECOMMENDATION OF**</u>
<u>**UNITED STATES MAGISTRATE JUDGE KATHARINE H. PARKER**</u>
<u>**ON DEFENDANT'S MOTION TO DISMISS**</u>

COHEN ZIFFER FRENCHMAN &
MCKENNA LLP
Kenneth H. Frenchman
Meredith Elkins
Maria Brinkmann
1350 Avenue of the Americas, 25th Floor
New York, New York 10019
Tel: (212) 584-1890

*Attorneys for Plaintiff*
*The John Gore Organization, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

FACTUAL ALLEGATIONS ...............................................................................................5

    A.    The Federal Policy ........................................................................................5

    B.    JGO's Allegations of "Direct Physical Loss or Damage"
        to Property.....................................................................................................6

    C.    The Magistrate's R&R ...................................................................................7

LEGAL STANDARDS ........................................................................................................8

    I.    STANDARD OF REVIEW OF MAGISTRATE'S REPORT
        AND RECOMMENDATIONS .......................................................................8

    II.    THE STANDARDS APPLICABLE TO INTERPRETATION OF
        AN INSURANCE POLICY .............................................................................9

ARGUMENT .....................................................................................................................10

    I.    ASSESSED UNDER THE PROPER STANDARD, JGO'S COMPLAINT
        SUFFICIENTLY ALLEGED "DIRECT PHYSICAL LOSS OR DAMAGE"
        TO INSURED PROPERTY ...........................................................................10

        A.    JGO Alleges "Direct Physical Loss or Damage" to JGO's
            Covered Properties......................................................................................11

        B.    The Magistrate Should Have Considered the Executive Orders Declaring that the
            "Virus Physically is Causing Property Loss and Damage" ................................19

    II.    JGO'S COMPLAINT ADEQUATELY STATES A CLAIM UNDER THE
        POLICY'S CIVIL AUTHORITY COVERAGE......................................................21

        A.    The Policy's Civil Authority Coverage Does Not Contain a "Total
            Prohibition of Access" Requirement ................................................................21

        B.    The Relevant Civil Authority Orders Directly Resulted from
            Physical Loss or Damage to Property Caused by SARS-CoV-2........................22

    III.    THE MAGISTRATE SHOULD HAVE CONSIDERED THE ABSENCE OF A
        VIRUS EXCLUSION – IF A VIRUS COULD NEVER CAUSE DIRECT PHYSICAL
        LOSS OR DAMAGE, NO SUCH EXCLUSIONS WOULD BE NECESSARY....24

IV.    UNDER THE MAGISTRATE'S INCORRECT REASONING,
        AMENDMENT WOULD BE FUTILE ...................................................................25

CONCLUSION ............................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*6593 Weighlock Drive, LLC v. Springhill SMC Corp.*,
   147 N.Y.S.3d 386 (N.Y. Sup. Ct. 2021) ...................................................................... 17

*10012 Holdings, Inc. v. Sentinel Ins. Co.*,
   507 F. Supp. 3d 482 (S.D.N.Y. 2020) ......................................................................... 17

*AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*,
   220 F. Supp. 3d 431 (S.D.N.Y. 2016) ......................................................................... 10

*Am. All. Ins. Co. v. Keleket X-Ray Corp.*,
   248 F.2d 920 (6th Cir. 1957) ...................................................................................... 14

*Arbeiter v. Cambridge Mut. Fire Ins. Co.*,
   1996 WL 1250616 (Mass. Super. Ct. Mar. 15, 1996) ................................................ 14

*Azalea, Ltd. v. Am. States Ins. Co.*,
   656 So. 2d 600 (Fla. Dist. Ct. App. 1995) ................................................................. 14

*Bd. of Educ. v. Int'l Ins. Co.*,
   720 N.E.2d 622 (Ill. App. Ct. 1999) ........................................................................... 14

*Belt Painting Corp. v. TIG Ins. Co.*,
   100 N.Y.2d 377 (2003) ................................................................................................ 9

*Blue Springs Dental Care, LLC v. Owners Ins. Co.*,
   488 F. Supp. 3d 867 (W.D. Mo. 2020) ........................................................................ 17

*Brown Bros. Elec. Contractors v. Beam Constr. Corp.*,
   41 N.Y.2d 397 (1977) .................................................................................................. 9

*Brown's Gym, Inc. v. The Cincinnati Ins. Co.*,
   No. 20 CV 3113, 2021 WL 3036545 (Pa. Ct. Com. Pl. July 13, 2021) ............................. 16, 25

*Cajun Conti, LLC v. Certain Underwriters at Lloyd's London*,
   No. 2020-02558, 2020 WL 8484870 (La. Dist. Ct. Nov. 4, 2020) ......................................... 16

*Cinemark Holdings, Inc. v. Factory Mut. Ins. Co.*,
   500 F. Supp. 3d 565 (E.D. Tex. 2021) ........................................................................ 16

*Cole v. Macklowe*,
   953 N.Y.S.2d 21 (1st Dep't 2012) .............................................................................. 9

*Cooper v. Travelers Indem. Co. of Ill.*,

2002 WL 32775680 (N.D. Cal. Nov. 4, 2002).................................................... 14

*Deer Mountain Inn LLC v. Union Ins. Co.*,
 No. 1:20-CV-0984, 2021 WL 2076218 (N.D.N.Y. May 24, 2021)........................................ 17

*DeMoura v. Continental Cas. Co.*,
 No. 2:20-cv-2912, 2021 WL 848840 (E.D.N.Y. Mar. 5, 2021).............................................. 17

*Derek Scott Williams PLLC v. Cincinnati Ins. Co.*,
 No. 20 C 2806, 2021 WL 767617 (N.D. Ill. Feb. 28, 2021) .................................................. 15

*Dino Palmieri Salons, Inc. v. State Auto. Mut. Ins. Co.*,
 No. CV-20-932117, 2020 WL 7258114 (Ohio Ct. Com. Pl. Nov. 17, 2020) .......................... 17

*Farmers Ins. Co. of Or. v. Trutanich*,
 858 P.2d 1332 (Or. Ct. App. 1993) ...................................................................................... 14

*Fed. Ins. Co. v. Am. Home Assurance Co.*,
 639 F.3d 557 (2d Cir. 2011)...................................................................................................... 9

*Food for Thought Caterers Corp. v. The Hartford Fin. Servs. Gr., Inc.*,
 No. 1:20-cv-03418, 2021 WL 860345 (S.D.N.Y. Mar. 6, 2021)...................................17, 22

*Goodwill Indus. v. Phila. Indem. Co.*,
 No. 30-2020-01169032-CU-IC-CXC, 2021 WL 476268 (Cal. Super. Ct. Jan. 28, 2021)....... 16

*Graff v. Allstate Ins. Co.*,
 54 P.3d 1266 (Wash. Ct. App. 2002) ...................................................................................... 14

*Grassia v. Scully*,
 892 F.2d 16 (2d Cir. 1989)......................................................................................................... 8

*Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*,
 No. 2:12–cv–04418, 2014 WL 6675934 (D.N.J. Nov. 25, 2014)...................................... 14, 18

*Hetrick v. Valley Mut. Ins. Co.*,
 1992 WL 524309 (Pa. Ct. Com. Pl. May 28, 1992)................................................................ 14

*In re Estates of Covert*,
 97 N.Y.2d 68 (2001) .................................................................................................................. 9

*In re Viking Pump, Inc.*,
 27 N.Y.3d 244 (2016) ...................................................................................................... 9, 15, 19

*Jeffrey M. Dressel, D.D.S., P.C. v. Hartford Ins. Co. of the Midwest, Inc.*,
 No. 20-CV-2777, 2021 WL 1091711 (E.D.N.Y. Mar. 22, 2021) ........................................... 17

*Kim-Chee LLC v. Phila. Indem. Ins. Co.*,

No. 1:20:cv-1136, 2021 WL 1600831 (W.D.N.Y. Apr. 22, 2021) ............................. 17, 18, 19

*L & D Serv. Station, Inc. v. Utica First Ins. Co.*,
    962 N.Y.S.2d 187 (2d Dep't 2013) ..................................................................... 9

*Matzner v. Seaco Ins. Co.*,
    1998 WL 566658 (Mass. Super. Ct. Aug. 12, 1998)........................................... 14

*Michael Cetta, Inc. v. Admiral Indem. Co.*,
    506 F. Supp. 3d 168 (S.D.N.Y. 2020)......................................................... 17, 22

*Mohawk Gaming Enters., LLC v. Affiliated FM Ins. Co.*,
    No. 8:20-cv-701, 2021 WL 1419782 (N.D.N.Y. Apr. 15, 2021)........................... 17

*Motorists Mut. Ins. Co. v. Hardinger*,
    131 F. App'x 823 (3d Cir. 2005)....................................................................... 14

*Nat'l Football League v. Vigilant Ins. Co.*,
    824 N.Y.S.2d 72 (1st Dep't 2006) ..................................................................... 10

*NeCo, Inc. v. Owners Ins. Co.*,
    No. 20-CV-04211-SRB, 2021 WL 601501 (W.D. Mo. Feb. 16, 2021)................... 16

*Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*,
    17 F. Supp. 3d 323 (S.D.N.Y. 2014)............................................................. 12, 13

*Office Sol. Grp., LLC v. National Fire Ins. Co. of Hartford*,
    No. 1:20-cv-4736, 2021 WL 2403088 (S.D.N.Y. June 11, 2021) ......................... 17

*Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*,
    No. 1:15-cv-01932-CL, 2016 WL 3267247 (D. Or. June 7, 2016)......................... 14

*Pillsbury Co. v. Underwriters at Lloyd's, London*,
    705 F. Supp. 1396 (D. Minn. 1989) ................................................................... 14

*Port Authority of N.Y. & N.J. v. Affiliated FM Ins. Co.*,
    311 F.3d 226 (3d Cir. 2002)............................................................... 14, 15, 18, 19

*Roundabout Theatre Co. v. Continental Casualty Co.*,
    302 A.D.2d 1 (1st Dep't 2002)............................................................ 2, 11, 12, 14

*Rye Ridge Corp. v. The Cincinnati Ins. Co.*,
    2021 WL 1600475 (S.D.N.Y. Apr. 23, 2021)...................................................... 17

*San Filippo v. U.S. Tr. Co. of New York*,
    No. 81 Civ. 19, 1987 WL 11554 (S.D.N.Y. 1987) .............................................. 15

v

*Schleicher and Stebbins Hotels, LLC v. Starr Surplus Lines Ins. Co.*,
No. 217-2020-CV-00309, 2021 WL 4029204 (N.H. Super. Ct. June 15, 2021) ......................16

*Sentinel Mgmt. Co. v. N.H. Ins. Co.*,
563 N.W.2d 296 (Minn. Ct. App. 1997) .................................................................. 14

*Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC*,
31 N.Y.3d 1002 (2018) ........................................................................ 15, 21

*Society Ins. Co.*, No. 20 C,
5965, 2021 WL 679109 (N.D. Ill. Feb. 22, 2021)......................................... 15, 17, 19

*Soundview Cinemas Inc. v. Great Am. Ins. Grp.*,
142 N.Y.S.3d 724 (N.Y. Sup. Ct. 2021) ................................................................ 17

*Studio 417, Inc. v. Cincinnati Ins. Co.*,
478 F. Supp. 3d 794 (W.D. Mo. 2020)............................................................. 16

*Ungarean, DMD v. CNA*,
2021 WL 1164836 (Pa. Com. Pl. Mar. 25, 2021) .................................................. 16

*United States v. Raddatz*,
447 U.S. 667 (1980) ....................................................................................... 9

*Vigilant Ins. Co. v. Bear Stearns Cos., Inc.*,
10 N.Y.3d 170 (2008) ...................................................................................... 9

*Visconti Bus Serv., LLC v. Utica Nat'l Ins. Grp.*,
142 N.Y.S.3d 903 (N.Y. Sup. Ct. 2021) ............................................................... 17

*W. Fire Ins. Co. v. First Presbyterian Church*,
437 P.2d 52 (Colo. 1968) ............................................................................... 14

*Yale Univ. v. Cigna Ins. Co.*,
224 F. Supp. 2d 402 (D. Conn. 2002) ................................................................. 14

**Statutes**

28 U.S.C. § 636(b)(1) ............................................................................... 1, 8, 9

**Other Authorities**

Christopher C. French, *Covid-19 Business Interruption Insurance Losses: The
Cases For and Against Coverage*, 27 CONN. INS. L. J. 1, 4 (July 1, 2020) (Ex.
B)..................................................................................................................................22

Insurance Commissioners, *COVID-19 Property & Casualty Insurance Business
Interruption Data Call, Part 1, Premiums and Policy Information* (June
2020), https://content.naic.org/sites/default/files/inline-files/COVID-
19%20BI%20Nat%27l%20Aggregates_0.pdf.........................................................23

Plaintiff The John Gore Organization, Inc. ("JGO"), pursuant to 28 U.S.C. § 636(b)(1) and Federal Rules of Civil Procedure 72, 6(a), and 6(d), hereby respectfully objects to the Report and Recommendation of Katharine H. Parker, United States Magistrate Judge ("Magistrate"), dated December 8, 2021 (Dkt. No. 31, the "R&R"), recommending the dismissal of this action, and asks this Court to deny Defendant Federal Insurance Company's ("Federal") Motion to Dismiss.

**PRELIMINARY STATEMENT**

As the leading presenter, producer, distributor, and marketer of Broadway theatre worldwide, JGO suffered the devastating impacts of the COVID-19 pandemic in unique ways during the sixteen-month live theater shutdown. While many other businesses were able to operate in some limited capacity and generate some revenue during the sixteen-month shutdown, the theater industry – which was the first to be ordered closed and one of the last to be permitted to reopen – had no viable alternative, as access to theaters was completely prohibited for over a year at the outset of the pandemic. Prior to the availability of COVID-19 vaccines and the implementation of enhanced safety protocols, theater spaces housing large audiences were particularly unsafe and vulnerable to the pandemic.[1] After JGO's property and business interruption insurer, Federal, abandoned JGO and denied coverage for JGO's business interruption losses that materialized during the pandemic, JGO was forced to bring this action. But the Magistrate recommended dismissing JGO's complaint on the ground that it had failed to sufficiently allege "physical loss or damage" under its "all risks" insurance policy.

In reaching its conclusion, the Magistrate committed numerous errors, including (1)

_____

[1] Indeed, in the past week of December 2021, during the Omicron strain outbreak, many Broadway shows have cancelled performances due to positive COVID-19 cases in their casts and crews.

1

misapplying the First Department's holding in *Roundabout Theatre Co. v. Continental Casualty Co.*, 302 A.D.2d 1 (1st Dep't 2002); (2) improperly resolving disputed factual issues in favor of Federal rather than accepting JGO's allegations as true and construing all reasonable inferences in its favor, and measuring JGO's allegations against trial courts' subjective views of the facts and science without receiving or considering scientific evidence; and (3) reading in requirements not found in the Policy to hold that JGO's losses do not trigger the Policy.  On this Court's *de novo* review, each of these errors warrants rejection of the R&R in favor of deference to New York's pleading standard and bedrock principles of insurance policy interpretation.

JGO's objections implicate the now-common question among trial courts of whether a policyholder's allegation that the actual presence of a dangerous, physical substance in, on, and around insured property, which alters the air and surfaces within that property and prevents its intended function, is sufficient to plead "direct physical loss or damage" under an "all risks" property and business interruption policy.  For decades, courts across the county have answered this question in the affirmative, finding that the presence of substances such as radiation, carbon monoxide, asbestos, ammonia, and E.coli bacteria can cause physical loss or damage.  Indeed, the few New York courts to have touched on this issue have reached the same conclusion.  This makes sense given that those substances are physical in nature and their presence can destroy the functionality of property.

Many courts around the nation have applied this same standard in the COVID-19 context, denying insurers' motions to dismiss where the policyholder alleged that the actual presence of the virus impaired the intended function of its properties.  These cases – both those addressing dangerous substances generally, and those addressing COVID-19 in particular – premised their holdings on numerous factors, including: (1) the plain meaning of the undefined terms "physical

2

loss or damage"; (2) that a reasonable insured who purchased an "all risks" business interruption insurance policy containing *no exclusion for virus, disease, or pandemic* can read the words "physical loss or damage" to encompass the loss of functionality of property due to the presence of a dangerous, physical substance; (3) that courts have implored the insurance industry for years to clarify these undefined words to no avail; (4) other terms and conditions of these policies, such as coverage for physical loss or damage caused by radiation, make clear that these policies are intended to cover losses caused by dangerous yet invisible substances; and (5) that insurers went to great lengths to expressly exclude coverage for losses caused by viruses after the original SARS pandemic through a standard virus exclusion, but chose not to include that exclusion in certain of their policies, like the policy Federal sold to JGO.

JGO's allegations fall squarely into this well-established authority. But rather than accept JGO's pleadings as true, construe all reasonable inferences in JGO's favor, and rely on decades of caselaw demonstrating why dismissal is inappropriate here, the Magistrate recommended dismissing JGO's complaint based on an erroneous view of the facts and the law.

First, the Magistrate determined that the First Department's "seminal" decision in *Roundabout* warranted dismissal of JGO's complaint. Yet *Roundabout* involved a claim of insurance coverage solely for economic losses untethered to any physical impact to insured property. As the court in *Roundabout* explained, that case was about "offsite" property damage to non-insured property in the vicinity of a fully functional, *undamaged*, insured property. It had nothing to do with an "on-site" physical impact by noxious substances that directly impaired the physical function of insured property like the damage and loss that JGO's property suffered. Here, in contrast, JGO has alleged that the actual presence of a physical, lethal, and resilient substance at its properties rendered those properties unusable for their intended purpose. Thus,

3

*Roundabout* has no bearing on the question of insurance coverage at issue here.

Second, the Magistrate ignored the applicable pleading standard by challenging the scientific plausibility of JGO's allegations based on the Magistrate's—or other New York trial courts'—own unsubstantiated theories, despite there being no scientific or expert evidence in the record and contrary to JGO's factual pleadings. The Magistrate's approach is particularly problematic in the context of COVID-19, where the science is highly complex and constantly evolving, and where it is critical that laypersons (judges and lawyers included) refrain from engaging in epidemiology.

Specifically, JGO alleged that SARS-CoV-2 causes "direct physical loss or damage" to property because SARS-CoV-2 is a resilient, dangerous substance that was physically present at JGO's premises, attached to property at those premises, and rendered those premises unfit and unusable for their intended purposes. JGO alleged that the coronavirus attaches to surfaces and can remain on them—and be transmitted by them—for weeks. Further, JGO alleged that as a Broadway theater company, it was particularly vulnerable to the novel coronavirus, which rendered large indoor gatherings dangerous. Despite these robust allegations, which certainly plead "direct physical loss or damage to property" as would be understood by an ordinary and reasonable businessperson, the Magistrate contradicted this Court's liberal pleading standard and made its own factual determinations—all based on the incorrect assessment that COVID-19 can never cause "physical loss or damage" as a matter of New York law. This premise is inconsistent with JGO's allegations that COVID-19 is a "resilient" virus that requires extensive remediation efforts, including "enhancing HVAC systems, creating a touchless environment, and implementing health screening and contact-tracing measures." It is also inconsistent with the experience of hundreds of millions of people who have contracted COVID-19 despite increased

4

cleaning measures, and with New York law, which does not demand an "extensive remediation" or "non-routine cleaning" prerequisite to plead physical loss or damage.

Third, the Magistrate read multiple requirements into the Policy that are not found in the Policy itself.  When relying on *Roundabout*, the Magistrate inserted the word "tangible" into the Policy's undefined term "direct physical loss or damage."  Then, the Magistrate inferred a requirement of "complete prohibition of access" into the Policy's Civil Authority coverage, when no such restriction is found in the Policy's language.  JGO is entitled to enforce the Policy as written and reasonably understood, and should not be foreclosed by Federal's post-hoc arguments about what Policy provisions mean.

Because JGO's allegations are sufficient to trigger numerous coverages under the policy, and because the Magistrate should not have resolved factual disputes and rendered expert opinions at the motion to dismiss stage, the Court should reject the R&R and deny Federal's Motion to Dismiss, and permit JGO the opportunity to proceed to discovery on its allegations.

**FACTUAL ALLEGATIONS**

**A.      The Federal Policy**

Federal sold JGO the Customary Series Entertainment Insurance Program policy number 7954-42-79 (the "Policy") for the policy period July 1, 2019 to July 1, 2020.  R&R at 3; JGO's Complaint (D.E. 1) ("Compl.") ¶¶ 5, 40.  The Policy broadly covers the "actual impairment of [JGO's] operations" due to "direct physical loss or damage to property."  R&R at 3; Compl. ¶¶ 41-46.  Among other things, the Policy provides coverage for: (i) loss resulting from the impairment of JGO's business activities; and (ii) loss caused by the prohibition of access to property – both JGO's Premises and its dependent venues – by a civil authority.  R&R at 3; Compl. ¶¶ 41-46.

5

Based on these coverages, JGO reasonably expected the Policy would cover its business interruption losses arising from the pandemic. Compl. ¶ 6. The Policy does not contain either a pandemic exclusion, a communicable disease exclusion, or the standard virus exclusion adopted by the insurance industry to preclude all losses resulting from viruses or diseases. R&R at 4; Compl. ¶¶ 5, 49. Indeed, despite such exclusions being prevalent in the marketplace when the Policy was sold, Federal chose to sell (and JGO paid for) the Policy with no such exclusions.

Finally, the Policy includes nearly 80 defined terms and phrases. The Policy states that only those "[w]ords or phrases that appear in **bold** print have special meanings and are defined." D.E. 1-1 at 84 (emphasis in original). As established below, none of the terms and phrases relied on by Federal to deny coverage have "special meanings."

**B.      JGO's Allegations of "Direct Physical Loss or Damage" to Property**

The Complaint is full of robust, specific allegations of physical loss or damage, which must be taken as true. MTD at 4-5. For example, the Complaint alleges that SARS-CoV-2 and COVID-19 have been present at and near JGO's Premises and dependent venues during the relevant period, since at least March 11, 2020. R&R at 3; Compl. ¶¶ 31-34, 39, 51, 55, 59. Moreover, the Complaint alleges that JGO has suffered losses due to the presence of SARS-CoV-2 and COVID-19 at and near JGO's Premises and dependent venues (Compl. ¶¶ 4, 36-39); droplets carrying the virus are physical objects, carrying a physical substance, that attach to and cause harm to property (*id.* ¶ 22); the virus is resilient and survives on surfaces for up to weeks (*id.* ¶¶ 22-23, 31); the presence of virus particles at and near JGO's Premises and dependent venues compromises the physical integrity of the structures they permeate, poses an imminent risk of physical loss of or physical damage to structures, and likewise renders such structures unusable (*id.* ¶ 23); and the presence of the virus requires improved and enhanced safety and sanitization measures, including installing hand sanitizing stations, plexiglass shields, and

6

COVID-related signage, as well as enhancing HVAC systems, and creating a touchless environment (*id.* ¶ 4).

JGO further alleged that it sustained business income losses as a result of the government civil authority orders (collectively, the "Orders") that – due to the direct physical loss or damage caused by the presence of the virus on and in property – suspended or severely curtailed the operations of all non-essential or high-risk businesses, banning gatherings of more than 10-50 people, and requiring individuals to "shelter in place," stay in their homes, and not to travel except to receive medical care, buy groceries, or perform essential jobs.  R&R at 2; Compl. ¶¶ 25, 37-38.  Orders issued in response to COVID-19 specifically stated that "the virus is physically causing property loss and damage."  R&R at 2; Compl. ¶ 26.  Critically, JGO alleged that the Orders resulted directly from direct physical loss and damage to JGO's premises and dependent venues (as well other properties in the vicinity), and in turn, JGO's business interruption losses resulted directly from the Orders.  Compl. ¶¶ 36, 38.

### C.      The Magistrate's R&R

The Magistrate held oral argument on Federal's Motion to Dismiss on December 3, 2021. At that hearing, the Magistrate inquired into specific provisions (and notably absent exclusions) in the Policy that demonstrate the reasonable expectations of JGO.  The Magistrate also asked about specifics of JGO's losses.  In response, JGO highlighted the need for fact discovery into its precise damages arising from the physical loss or damage suffered as a result of the pandemic. Oral Argument Transcript ("OA Tr.") at 42-44 (discussing that whether restoration efforts taken to make the theaters operable constitute "repairs and restorations" is a fact issue on which JGO is entitled to discovery); 50-51 (issue of time period that COVID-19 particles can cause damage is a fact issue and must be afforded expert discovery).

7

Rather than acknowledge the unique facts of JGO's claim, the R&R echoes many other trial courts, mistakenly interpreting New York law as requiring some "tangible" or visible damage to trigger JGO's Policy.  R&R at 12.  Effectively holding that, as a matter of law, COVID-19 could *never* cause that type of damage, the Magistrate recommended dismissal of JGO's claim.  However, the Magistrate further recommended granting JGO leave to amend its complaint.

Although JGO's complaint sufficiently alleged physical loss or damage, the R&R made clear that the Magistrate had not accepted JGO's allegations as true and construed all reasonable inferences in JGO's favor.  Certain of the Magistrate's suggestions and views on JGO's allegations are inconsistent with prevailing science, and erroneously interpret scientific guidelines, which since March 2020 have continued to change, even after COVID-19 vaccines became widely available.

**LEGAL STANDARDS**

I.    **STANDARD OF REVIEW OF A MAGISTRATE'S REPORT AND RECOMMENDATION**

"[T]he statutory language of section 636(b)(1) affords the district court broad latitude in considering [a] magistrate's recommendation." *Grassia v. Scully*, 892 F.2d 16, 19 (2d Cir. 1989).  Regardless of whether the parties object to a magistrate judge's recommendation, "the district court is not bound by the recommendation of the magistrate." *Id.*  Where a party chooses to submit objections, "section 636(b)(1) provides that '[a] judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.'" *Id.* (quoting 28 U.S.C. § 636(b)(1)).  "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate . . . [and] may also receive further evidence." 28 U.S.C. § 636(b)(1).  As

8

used in section 636(b)(1), "the phrase *de novo* determination . . . was selected by Congress 'to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations.'" *Id.* (quoting *United States v. Raddatz*, 447 U.S. 667, 676 (1980)).

## II.   THE STANDARDS APPLICABLE TO INTERPRETATION OF AN INSURANCE POLICY

Under New York law, "[i]nsurance policies are, in essence, creatures of contract, and accordingly, subject to principles of contract interpretation." *In re Estates of Covert*, 97 N.Y.2d 68, 76 (2001). In determining meaning, "[u]nambiguous provisions of an insurance contract" are given "their plain and ordinary meaning." *L & D Serv. Station, Inc. v. Utica First Ins. Co.*, 962 N.Y.S.2d 187, 188 (2d Dep't 2013) (quoting *Vigilant Ins. Co. v. Bear Stearns Cos., Inc.*, 10 N.Y.3d 170, 177 (2008)). Insurance contracts, and in particular undefined terms found within an insurance contract, must be interpreted according to "common speech" and consistent with the "reasonable expectations" of the average insured. *See Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 383 (2003); *Brown Bros. Elec. Contractors v. Beam Constr. Corp.*, 41 N.Y.2d 397, 400 (1977) ("[T]he aim is a practical interpretation of the expressions of the parties to the end that there be a 'realization of [their] reasonable expectations.'"). New York courts regularly "refer to the dictionary to determine the plain and ordinary meaning of words." *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011).

Like any contract, an insurance policy "should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties." *Cole v. Macklowe*, 953 N.Y.S.2d 21, 23 (1st Dep't 2012). Courts must construe the policy in a way that "affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect." *In re Viking Pump, Inc.*, 27 N.Y.3d 244, 257

9

(2016), *opinion after certified question answered,* 148 A.3d 633 (Del. 2016).  If there is any

ambiguity in the policy language, it must be resolved against the insurer and in favor of

coverage.  *See AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*, 220 F. Supp. 3d 431, 436

(S.D.N.Y. 2016) ("[I]f policy language is ambiguous, New York law provides that such

ambiguities must be construed in favor of the insured and against the insurer.").  Any arguably

reasonable reading of the policy in favor of the policyholder controls as a matter of law.  *See*

*Nat'l Football League v. Vigilant Ins. Co.*, 824 N.Y.S.2d 72, 76 (1st Dep't 2006) (finding that

insured's "plausible interpretation" supporting coverage "must be sustained").

**ARGUMENT**

I.    **ASSESSED UNDER THE PROPER STANDARD, JGO'S COMPLAINT
SUFFICIENTLY ALLEGED "DIRECT PHYSICAL LOSS OR DAMAGE" TO
INSURED PROPERTY**

The Magistrate acknowledged that the Policy is a valid and enforceable contract, that JGO

performed its obligations thereunder, and that JGO suffered losses, including the devastating loss

of business income resulting from the coronavirus pandemic and the presence of the virus at and

around JGO's premises.  Compl. ¶¶ 5, 38-40; R&R at 8.  The Magistrate even purported to accept

that "COVID-19 droplets were present in the air at Plaintiff's facilities or covered facilities at least

for some period of time;" "COVID-19 can be transmitted by touching a contaminated surface;"

and that "COVID-19 is a dangerous virus that can cause death."  R&R at 8.  However, the

Magistrate recommended dismissal of this action by refusing to accept JGO's remaining factual

allegations.  Rather than follow the Rule 12 requirement that the Court must accept the allegations

in JGO's complaint as true, the Magistrate engaged in a fact-finding exercise and determined that

"[t]he presence of COVID-19 droplets or particles in the air and on surfaces does not result in a

loss of property requiring replacement of property; nor does it damage property requiring repair as

contemplated in the policy." R&R at 13.  This holding contravenes the plain language of the Policy

10

and JGO's well-pled allegations and reasonable expectations.

### A.    JGO Alleges "Direct Physical Loss or Damage" to JGO's Covered Properties

JGO's complaint is replete with detailed allegations that the actual and imminent threat of COVID-19 at its theaters and other properties altered the surfaces of the properties and air within the properties, impairing the physical function of the properties and rendering them unusable for their core intended purpose, thereby causing physical loss and damage to insured property. Indeed, JGO alleged that the virus is (1) challenging to contain (Compl. ¶¶ 17, 21), (2) highly contagious (*id.* ¶¶ 20, 55), (3) deadly (*id.* ¶ 20), (4) resilient (*id.* ¶ 23), (5) a physical object that attaches to and causes harm to property (*id.* ¶ 22), (6) can survive on various surfaces for weeks (*id.* ¶ 23), and (7) compromises the physical integrity of the structures to which it attaches and facilitates transmission of human disease (*id.*).  JGO also alleged that theaters are particularly susceptible to circumstances favorable to the spread of the virus and that its losses were caused, in part, by the presence of the virus on its properties.  *Id.* at ¶¶ 3, 4, 16, 33, 36, 39, 59.

These allegations sufficiently and plausibly plead "physical loss or damage" based on decades of case law and the plain language of the Policy.  In holding otherwise, the Magistrate not only ignored persuasive authority and the plain terms of the Policy, but also failed to construe JGO's well-pled factual allegations as true and draw all reasonable inferences therefrom in the light most favorable to JGO as required.

In ignoring (at best) or prematurely fact-finding (at worst) JGO's allegations of SARS-CoV-2's presence on, at, and around JGO's Premises and dependent venues, which rendered such property unsafe and unusable for its intended purpose, the Magistrate relied heavily on *Roundabout Theatre Co. v. Continental Casualty Co.*, 751 N.Y.S.2d 4 (1st Dep't 2002), which the Magistrate called the "seminal case in New York discussing the meaning of ['direct physical

11

loss or damage']."  R&R at 9.  But in *Roundabout Theatre*, it was undisputed that the policyholder *did not* suffer any physical loss or damage to its property; rather, access to the insured theater was prohibited by a municipal order based on a construction accident nearby. 751 N.Y.S.2d at 5.  In that circumstance, where there was no allegation of physical loss or damage at the insured premises and the policy at issue did not include coverage for losses sustained due to physical damage to nearby properties (like the Policy's Civil Authority coverage here), the court denied coverage.  *Roundabout Theatre* did not address the key question before this Court: whether a dangerous physical substance that pervades a property and renders it unusable for its intended purpose constitutes "physical loss or damage" to property.  Under well-settled New York law, the answer to that question is yes.

This conclusion is inescapable in light of this Court's later recognition that loss of utility due to the presence of dangerous substances constitutes physical loss or damage.  *See Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 325 (S.D.N.Y. 2014).  The issue in *Newman Myers* was whether ConEd's preemptive shutdown of the office building's power in anticipation of storm-related flooding constituted the requisite physical loss or damage to property to trigger coverage.  *Id.* at 328-29.  Relying upon cases where courts found that the presence of fumes or noxious gas satisfied the "direct physical loss or damage" requirement, the policyholder argued that structural damage was not required under the policy, and that the preemptive closure of its building in preparation for a coming storm was sufficient to trigger coverage.  *Id.* at 329.

Significantly, the court agreed that "the critical policy term at issue, requiring 'physical loss or damage,' does not require that the physical loss or damage be tangible, structural or even visible," recognizing that "[t]he invasions of noxious or toxic gases . . . rendering the premises

unusable or uninhabitable, [are] held to suffice, because even invisible fumes can represent a form of physical damage." *Id.* at 330 (emphasis added). Notwithstanding, the court concluded that these cases – each involving "some compromise to the physical integrity of the workplace" – were distinguishable from the facts before it and held that "direct physical loss or damage" did not encompass "mere loss of use of a premises, where there has been no physical damage to such premises." *Id.* at 330-31. Thus, although *Newman Meyers* may have "affirmed" *Roundabout* as applied to a case where there was <u>no</u> alleged physical impact to insured property, *Newman Myers* made clear that *Roundabout* is not applicable to the situation where an insured *has* alleged "direct physical loss or damage" due to an invisible, noxious substance.

Here, the Complaint plausibly alleges "direct physical loss or damage" to JGO's Premises, dependent venues, and nearby properties based on the actual presence of a lethal substance at those properties. *See* Compl. ¶¶ 22-23, 31-33, 39, 55, 59. Thus, the Magistrate's reliance on *Roundabout* is misplaced, and *Newman Myers* strongly supports that JGO's allegations are sufficient to plead physical loss or damage. *Newman Myers* expressly recognizes that loss of utility due to the presence of dangerous substances constitutes physical loss or damage.

The Magistrate wholly failed to address *Schlamm Stone & Dolan, LLP v. Seneca Insurance Co.*, in which the New York Supreme Court held "the presence of noxious particles, both in the air and on surfaces in plaintiff's premises, would constitute property damage," reasoning that "[t]he carpets and other surfaces are property of plaintiff, and the presence [of] noxious particles thereon *clearly impairs plaintiff's ability to make use of them*." 2005 WL

13

600021, at *4-5 (N.Y. Sup. Ct. Mar. 4, 2005) (emphasis added).[2]  The Magistrate further found, incorrectly, that JGO's reliance on the Third Circuit's application of New York law in *Port Authority of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) was "misplaced."  R&R at 14.  There, the court held that, in the context of asbestos, physical loss or damage occurs when the "actual release of asbestos fibers" has rendered, or "an imminent threat of [such] release" would render "the property such that *its function* is nearly eliminated or destroyed."  *Port Auth.*, 311 F.3d at 236 (emphasis added).  Rather than accepting JGO's consistent allegations, the Magistrate used *Port Authority* to impose a "higher threshold" than a deadly contagious virus in order to find "invisible physical damage to a building."  R&R at 14.  The Magistrate imposed a factual standard that contamination must be "in such quantity to be comparable to that of fire, water or smoke on a structure's use and function."  *Id*. at 15.  Then, without the benefit of any discovery or expert testimony, the Magistrate unilaterally held that

---

[2] New York law is in accord with numerous jurisdictions that find the actual presence of dangerous particles of all types constitutes physical loss or damage.  *Accord Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 2:12–cv–04418, 2014 WL 6675934, at *2, 6 (D.N.J. Nov. 25, 2014) (ammonia); *Am. All. Ins. Co. v. Keleket X-Ray Corp.*, 248 F.2d 920, 925 (6th Cir. 1957) (radioactive dust and radon gas); *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 54 (Colo. 1968) (en banc) (gasoline vapors); *Pillsbury Co. v. Underwriters at Lloyd's, London*, 705 F. Supp. 1396, 1399 (D. Minn. 1989) (health-threatening organisms); *Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, No. 1:15-cv-01932-CL, 2016 WL 3267247 (D. Or. June 7, 2016) (wildfire smoke), *vacated by parties' joint stipulation*, 2017 WL 1034203 (D. Or. 2017); *Hetrick v. Valley Mut. Ins. Co.*, 1992 WL 524309, at *2 (Pa. Ct. Com. Pl. May 28, 1992) (oil); *Farmers Ins. Co. of Or. v. Trutanich*, 858 P.2d 1332, 1336 (Or. Ct. App. 1993) (methamphetamine fumes*); Azalea, Ltd. v. Am. States Ins. Co.*, 656 So. 2d 600, 601 (Fla. Dist. Ct. App. 1995) (unknown pollutant); *Arbeiter v. Cambridge Mut. Fire Ins. Co.*, 1996 WL 1250616, at *1-2 (Mass. Super. Ct. Mar. 15, 1996) (oil fumes); *Sentinel Mgmt. Co. v. N.H. Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997) (asbestos); *Matzner v. Seaco Ins. Co.*, 1998 WL 566658, at *4 (Mass. Super. Ct. Aug. 12, 1998) (carbon monoxide); *Bd. of Educ. v. Int'l Ins. Co.*, 720 N.E.2d 622, 626 (Ill. App. Ct. 1999) (asbestos); *Yale Univ. v. Cigna Ins. Co.*, 224 F. Supp. 2d 402, 413-14 (D. Conn. 2002) (asbestos and lead); *Graff v. Allstate Ins. Co.*, 54 P.3d 1266, 1269 (Wash. Ct. App. 2002) (methamphetamine vapors); *Cooper v. Travelers Indem. Co. of Ill.*, 2002 WL 32775680, at *1 (N.D. Cal. Nov. 4, 2002) (coliform bacteria and E.coli); *Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 824-27 (3d Cir. 2005) (E.coli).

14

COVID-19 droplets are not comparable to damage done by fire, water or smoke—and so they cannot possibly cause physical loss or damage. *Id.*

The Magistrate also seemed to adopt Federal's position that any "direct physical loss or damage" must be "tangible." But Federal could have easily limited coverage to include only loss or damage that resulted in "tangible damage" to property – but did not – and the Court cannot now rewrite the Policy under the guise of contract interpretation. *Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC*, 31 N.Y.3d 1002, 1006-07 (2018); *San Filippo v. U.S. Tr. Co. of New York*, No. 81 Civ. 19, 1987 WL 11554, at *3 (S.D.N.Y. 1987) (rejecting rewrite of policy's "personal injury liability" definition to include civil rights violations absent from definition's express terms).

Indeed, the Magistrate's interpretation of the term "physical loss or damage" effectively erases the term "physical loss" from the Policy and ignores that "physical loss" and "damage" are distinct concepts that the Policy separates with the disjunctive "or." This violates basic rules of contract construction under New York law, which requires policies to be construed to "afford[] a fair meaning to all of the language employed by the parties in the contract and leave[] no provision without force and effect." *In re Viking Pump, Inc.*, 27 N.Y.3d at 257; *see also Kingray,* 2021 WL 837622, at *8 (rejecting insurer's imposition of a physical alteration requirement under a policy that covered "direct physical loss of or damage" to property, reasoning that "Defendant's interpretation of the contract requires 'loss' to share a meaning with 'damage,' which violates the canon that every word be given meaning."); *Derek Scott Williams PLLC v. Cincinnati Ins. Co.*, No. 20 C 2806, 2021 WL 767617, at *4 (N.D. Ill. Feb. 28, 2021) (requiring physical alteration "writes the term 'loss' out of the definition"); *In re Society Ins. Co.*, No. 20 C 5965, 2021 WL 679109, at *8 (N.D. Ill. Feb. 22, 2021) (finding where coverage was

15

not "limited to direct physical 'damage'" and instead "extend[ed] to direct physical 'loss of' property," the plaintiffs "need not plead or show a change to the property's physical characteristics."); *Ungarean, DMD v. CNA*, 2021 WL 1164836, at *6 (Pa. Com. Pl. Mar. 25, 2021) ("[T]he concepts of 'loss' and 'damage' are separated by the disjunctive 'or,' and, therefore, the terms must mean something different from each other.").

For this reason, certain courts throughout the country have rejected the Magistrate's holding that an invisible, noxious substance like COVID-19 is incapable of causing physical loss or damage as a matter of law. These courts have recognized that an insured's allegation that the actual or threatened physical presence of the virus at and around its insured premises rendered that premises unusable for its intended function is sufficient to plead physical loss or damage to property.[3] And in many of the cases where a court in New York has granted a motion to dismiss

---

[3] *See, e.g.*, *Kingray*, 2021 WL 837622, at *8 (allegations of a "virus in the air" alleged "loss" because of dangerous conditions); *Brown's Gym, Inc. v. The Cincinnati Ins. Co.*, No. 20 CV 3113, 2021 WL 3036545, at *20 (Pa. Ct. Com. Pl. July 13, 2021) (holding that plaintiff's "averments regarding the 'continuous presence' of the coronavirus on its covered premises that rendered its property unusable, unsafe, and 'unfit for its intended use' . . . adequately alleged 'physical loss or damage' to its property"); *Schleicher and Stebbins Hotels, LLC v. Starr Surplus Lines Ins. Co.*, No. 217-2020-CV-00309, 2021 WL 4029204, at *10 (N.H. Super. Ct. June 15, 2021) (granting partial summary judgment to plaintiffs, concluding the term 'loss or damage' "encompasses the kind of damage caused by the spread of SARS-CoV2 to the Plaintiffs' properties"); *NeCo, Inc. v. Owners Ins. Co.*, No. 20-CV-04211-SRB, 2021 WL 601501, at *4 (W.D. Mo. Feb. 16, 2021) (holding that plaintiff "adequately alleged a claim for direct physical loss" by asserting "that COVID-19 was present on Plaintiff's premises" and that "the presence of COVID-19 on property impairs its value, usefulness, and/or normal function"); *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 798 (W.D. Mo. 2020) ("direct physical loss" alleged by "the presence of [the virus] 'render[ed] physical property in [the virus's] vicinity unsafe and unusable,'" forcing it "to suspend or reduce business at their covered premises"); *Cinemark Holdings, Inc. v. Factory Mut. Ins. Co.*, 500 F. Supp. 3d 565, 569 (E.D. Tex. 2021) (plaintiff "alleges that COVID-19 was actually present and actually damaged the property by changing the content of the air"); *Cajun Conti, LLC v. Certain Underwriters at Lloyd's London*, No. 2020-02558, 2020 WL 8484870, at *1 (La. Dist. Ct. Nov. 4, 2020) ("If COVID constitutes a physical loss or damage, it is clear that the question of how COVID impacts the environment is a genuine issue of material fact"); *Goodwill Indus. v. Phila. Indem. Co.*, No. 30-2020-01169032-CU-IC-CXC, 2021 WL 476268, at *2 (Cal. Super. Ct. Jan. 28, 2021) (complaint "expressly alleges . . .

16

a claim for losses as a result of COVID-19, the policyholder ***<u>did not</u> allege that COVID-19 was present on its property and causing physical loss or damage***.[4]  Regardless, the mere number of courts that have dismissed a policyholder's COVID-19 coverage claim on a motion to dismiss is

that coronavirus and COVID-19 were present at its properties at the time of the . . . closure orders"); *Dino Palmieri Salons, Inc. v. State Auto. Mut. Ins. Co.*, No. CV-20-932117, 2020 WL 7258114, at *4 (Ohio Ct. Com. Pl. Nov. 17, 2020) ("Plaintiffs' premises sustained physical loss or damage directly from the presence of physical Covid-19 particles"); *In re Society Ins. Co.*, 2021 WL 679109, at *8 n.5 (fact issue as to whether "the coronavirus particles themselves have in fact rendered, or could render, physical harm to their property given that the virus lingers on surfaces and remains in the air"); *Blue Springs Dental Care, LLC v. Owners Ins. Co.*, 488 F. Supp. 3d 867, 877 (W.D. Mo. 2020) (plaintiffs plausibly alleged that COVID-19 had "physically occupied and contaminated their dental clinics and thereby deprived them of their use of those clinics by making them unusable"); *JDS Construction Group, LLC, et al. v. Continental Casualty Co.*, Case No. 2020 CH 5678 (Cir. Ct. Cook Cty., Ill. Oct. 25, 2021).

[4] *See*, *e.g.*, *Visconti Bus Serv., LLC v. Utica Nat'l Ins. Grp.*, 142 N.Y.S.3d 903, 912-13 (N.Y. Sup. Ct. 2021) (insured "explicitly affirmed that its premises [are] not infected with the Covid virus"); *6593 Weighlock Drive, LLC v. Springhill SMC Corp.*, 147 N.Y.S.3d 386, 394 (N.Y. Sup. Ct. 2021) (no allegation of virus on plaintiff's premises); *Soundview Cinemas Inc. v. Great Am. Ins. Grp.*, 142 N.Y.S.3d 724, 730 (N.Y. Sup. Ct. 2021) (no claims COVID-19 was at insured premises or caused physical loss or damage); *Food for Thought Caterers Corp. v. The Hartford Fin. Servs. Gr., Inc.*, No. 1:20-cv-03418, 2021 WL 860345, at *5 (S.D.N.Y. Mar. 6, 2021) (reasoning that "Food for Thought only speculates that the virus 'likely infected' its premises"); *Office Sol. Grp., LLC v. National Fire Ins. Co. of Hartford*, No. 1:20-cv-4736, 2021 WL 2403088, at *7 (S.D.N.Y. June 11, 2021) (no allegations of physical loss or damage "aside from the potential, speculative infection of the COVID-19 virus"); *Deer Mountain Inn LLC v. Union Ins. Co.*, No. 1:20-CV-0984, 2021 WL 2076218, at *3 (N.D.N.Y. May 24, 2021) (affirmatively alleged that the closure orders, not COVID-19, caused its "physical loss" to property); *Kim-Chee LLC v. Phila. Indem. Ins. Co.*, No. 1:20:cv-1136, 2021 WL 1600831, at *5 (W.D.N.Y. Apr. 22, 2021) (acknowledging a biological agent that renders insured property unusable constitutes direct physical loss or damage); *Rye Ridge Corp. v. The Cincinnati Ins. Co.*, 2021 WL 1600475, at *2 (S.D.N.Y. Apr. 23, 2021) (conclusory allegations but no facts alleged that properties experienced physical loss or damage from the presence of COVID-19); *Mohawk Gaming Enters., LLC v. Affiliated FM Ins. Co.*, No. 8:20-cv-701, 2021 WL 1419782 (N.D.N.Y. Apr. 15, 2021) (plaintiff failed to allege the presence of virus at an insured location); *Jeffrey M. Dressel, D.D.S., P.C. v. Hartford Ins. Co. of the Midwest, Inc.*, No. 20-CV-2777, 2021 WL 1091711, at *4 (E.D.N.Y. Mar. 22, 2021) (presence of virus "never alleged"); *DeMoura v. Continental Cas. Co.*, No. 2:20-cv-2912, 2021 WL 848840, at *6 (E.D.N.Y. Mar. 5, 2021) (plaintiff "does not allege that the virus was, in fact, present in his business"); *10012 Holdings, Inc. v. Sentinel Ins. Co.*, 507 F. Supp. 3d 482, 488-89 (S.D.N.Y. 2020) (no claims COVID-19 was at insured premises or caused physical loss or damage); *Michael Cetta, Inc. v. Admiral Indem. Co.*, 506 F. Supp. 3d 168, 184 (S.D.N.Y. 2020) (no allegation of COVID-19 on insured premises).

not controlling or compelling here. As a trial court judge in Illinois recently noted: "those decisions [dismissing plaintiffs' COVID-19 coverage complaints] are not helpful in determining whether the facts alleged in this complaint satisfy the legal standard . . . . Judges are not sheep, and I do not decide a case by counting noses. Further, the 'herd' can be wrong." *JDS Constr. Group, LLC, et al. v. Cont'l Cas. Co.*, Case No. 2020 CH 5678, at 4 (Ill. Cir. Ct., Cook Cty. Oct. 25, 2021). None of the trial court decisions the Magistrate cited have entertained expert testimony, conducted discovery, or otherwise exercised proper fact-finding over hotly disputed (and rapidly developing) scientific concepts. Trial courts should not take judicial notice of disputed and novel scientific theories without the benefit of expert discovery. The scientific reports and opinions related to COVID-19 are discussed in the media literally every day. If there is one thing upon which all parties can agree, it is the vast difference of opinions with respect to the coronavirus, even among doctors and scientists. This subject matter, at this time, is especially ill-suited for judges to take judicial notice of argued "facts," rather than hearing from experts.

The Magistrate further relied on *Kim-Chee,* but in that case, the court found that *Roundabout* was inapplicable to an insurance claim in the COVID-19 context because in *Roundabout* the physical loss or damage was alleged to have occurred at non-insured property and, thus, the insured had alleged a mere "loss of use." 2021 WL 1600831, at *5. *Kim-Chee* recognized that cases such as *Port Authority*, 311 F.3d at 236 (asbestos), *Gregory Packaging*, 2014 WL 6675934 (ammonia), and *Schlamm Stone*, 2005 WL 600021 (dangerous dust particles), comprised the applicable line of authority when an insured has alleged direct physical loss or damage due to the presence of a dangerous substance on insured property. Those cases, *Kim-Chee* observed, reflected a coverage spectrum from easily cleanable and innocuous dust (not covered) to a "persistent chemical or biological agent," such as ammonia or E. coli (covered).

18

Based solely on the deficient allegations in *Kim-Chee*, the court factually found that COVID-19 was more akin to dust that could be easily cleaned, than substances like E. coli or ammonia. Here, in contrast, JGO's allegations regarding the nature of COVID-19 and its resilience are robust, plausible, and must be accepted as true at this stage. Unlike in *Port Authority*, where the insured premises "had continuous and uninterrupted usage for many years," JGO's premises were completely shut down from March 2020 until well into 2021. At the very least, whether COVID-19 is more like easily cleanable dust, as Federal suggests, or a dangerous substance that has killed millions of people, is a quintessential question of fact that cannot be resolved without discovery. *See, e.g.*, *In re Society*, 2021 WL 679109, at *8 n.5 (extent of harm caused by COVID-19 particles that attached to property is a factual issue). In resolving this fact-question in Federal's favor at the motion to dismiss state, the Magistrate effectively and improperly issued an expert opinion (or at least took judicial notice) that COVID-19 is more akin to dust (not covered) than a lethal substance like ammonia (covered).

**B.      The Magistrate Should Have Considered the Executive Orders Declaring That the "Virus Physically is Causing Property Loss and Damage"**

Under longstanding New York law, the language of insurance "contracts must be interpreted according to common speech and consistent with the reasonable expectation of the average insured." *In re Viking Pump, Inc.*, 27 N.Y.3d at 257. Here, Mayor de Blasio issued an executive order impacting JGO's business on the ground that "the virus physically is causing property loss and damage." Compl. ¶ 26. JGO alleges that Dallas County Judge Clay Jenkins issued a similar executive order in part, on the ground that "the COVID-19 virus causes property loss or damage due to its ability to attach to surfaces for prolonged periods of time . . . ." *Id.* ¶ 27; *see also* OA Tr. at 58. These orders are strong evidence that a reasonable, average insured

19

would view COVID-19 as causing "physical loss or damage" to property, a term that is not defined in the Policy.

In oral argument, the Magistrate minimized the import of Mayor de Blasio's statement in his Executive Order that the virus was causing physical damage: "[H]e's no more authority than you or I, I mean maybe a scientist is an authority but . . . why is that evidence that it's damaging property, some politician saying something?" OA Tr. at 34. But that is precisely the point – a court of law is no more equipped than a politician to opine on the causes of physical loss or damage. *See* OA Tr. at 34-35 ("Well, okay, you don't feel qualified to say it, I don't feel qualified to say it, Mayor de Blasio doesn't feel qualified to say it so, so how do you determine that, in fact, Covid cannot . . . physically damage property[?]"). This is a quintessential question of fact that cannot be resolved without discovery.

The relevant inquiry on a 12(b)(6) motion is whether the plaintiff has alleged plausible facts sufficient to state a claim for relief. It is indisputable that the Complaint alleges the pervasive presence of the virus on and around JGO's Premises. *See, e.g.*, Compl. ¶ 51. These allegations are not speculative, nor are they without factual support independent of any statements in the Orders. JGO cites the Orders merely to support the conclusion that it is reasonable to construe these allegations as satisfying the term "physical loss or damage" under the Policy. To the extent the Magistrate found that, as Federal argues, the Orders are "too general and unsupported by specific facts," MTD at 14, JGO is entitled to discovery to support the Orders' affirmation of an established reality of which New Yorkers were well-aware – the virus pervades property and airspace, rendering it unsafe and unusable for its intended purpose. This is particularly true where, as here, many of the properties are theaters designed to hold large audiences. Simply put, the "virus physically is causing property loss and damage."

II.     **JGO'S COMPLAINT ADEQUATELY STATES A CLAIM UNDER THE POLICY'S CIVIL AUTHORITY COVERAGE**

Just as the Magistrate's findings regarding JGO's allegations of "direct physical loss or damage" are incorrect, the recommendation to dismiss JGO's claim for Civil Authority coverage is also erroneous.  Specifically, JGO's Complaint sufficiently alleges: (1) that access to JGO's Premises or a dependent business premises were prohibited by a civil authority; and (2) that the "prohibition of access by a civil authority . . . [was] the direct result of direct physical loss or damage to property" away from JGO's premises or dependent business premises.  Compl. ¶¶36-37; 47.

A.      **The Policy's Civil Authority Coverage Does Not Contain a "Total Prohibition of Access" Requirement**

The Magistrate found that JGO failed to adequately plead Civil Authority coverage because there was "no actual prohibition of access" to JGO's premises or dependent business premises.  R&R at 17.  However, the Complaint specifically alleges that the Orders prohibited access to all businesses deemed "non-essential," including performance venues across the country.  Compl. ¶¶ 36-37, 47, 60.  Certain Orders expressly required that non-essential businesses reduce the workforce present at the business properties to zero.  *Id.* ¶ 60.

Notably, the Policy does not define "prohibition of access," much less require a complete inability to access properties.  To the extent that the Magistrate is reading in a total prohibition of access requirement, any such interpretation impermissibly rewrites the Policy under the guise of policy interpretation.  *See Skanska*, 31 N.Y.3d at 1006.  The more reasonable reading of the Policy language is that it requires prohibition of access to the property for its intended purpose –here, the selling of tickets and advertising, the performing of shows, and the attending of performances by audience members.  Any other reading makes no sense.  A street closure caused by an explosion is a perfect example of a scenario that would clearly implicate civil authority

21

coverage.  If a theater entrance were inaccessible due to the street closure, but employees could still enter through a back alley, this could not possibly change the policyholder's entitlement to coverage.  The property could not be used for its intended purpose – as a theater open to the public.   Any argument that the property is still accessible because certain employees could still gain access is nonsensical and flies in the face of a policyholder's reasonable expectations of coverage.

Moreover, the Magistrate once again cites inapplicable case law for this proposition.  For example, the policies at issue in *Food For Thought* and *Sharde Harvey* contained markedly distinct policy language, and required access to be "*specifically* prohibited by order of a civil authority."  *Food for Thought*, 2021 WL 860345 at *6; *Sharde Harvey*, 2021 WL 1034259 at *2.  The *Food for Thought* court referenced this heightened requirement in its holding.  *Food for Thought*, 2021 WL 860345 at *6 (holding that of the orders closing all "non-essential businesses statewide . . . none . . . 'specifically prohibited' access to the plaintiff's property").  *Michael Cetta* is distinguishable because there was <u>no</u> allegation of prohibited access.  506 F. Supp. 3d at 184 (noting that the complaint fails to "allege that delivery workers, restaurant employees, <u>or</u> <u>customers</u> could not access the address" but merely "claims that the closure orders limited restaurants . . . to serve 'take-out and delivery' items." (emphasis added)).

Here, the Complaint adequately alleges that the Orders prohibited access to both JGO's Premises and dependent venues.  The Magistrate's rejection of those allegations is groundless and should not be followed.

**B.**     <u>**The Relevant Civil Authority Orders Directly Resulted from Physical Loss or Damage to Property Caused by SARS-CoV-2**</u>

The Magistrate went on to hold that, even assuming JGO has sufficiently alleged "direct physical loss or damage" and "prohibited access," JGO failed to satisfy the requirement that the

22

prohibited access be "*the direct result of direct physical loss or damage to property away from such premise*s." R&R at 18. Yet this position is contrary to JGO's allegations regarding the nature and cause of these orders (Compl. ¶¶ 25-27, 29-30), and the nature of the Orders themselves, which make clear that they were driven by physical loss or damage to property (*id.* ¶¶ 26-28). Indeed, JGO is not arguing that these orders somehow "redefine pre-existing contract terms," as *Sharde Harvey* suggests, 2021 WL 1034259, at *1. Rather, the Orders themselves are simply the best evidence of why they were issued, i.e., in part, as a result of direct physical loss or damage to property.

The Magistrate's holding is also contrary to the plain terms of the Policy. The dictionary definition of "direct" includes "stemming immediately from a source" and "characterized by close logical, causal, or consequential relationship."[5] "Result" is commonly defined to mean "a consequence, effect, or outcome of something."[6] Thus, for the "prohibited access" to be a "direct result" of the "direct physical loss or damage," it must be an "outcome" or "consequence" that "stems immediately from" such loss or damage. It cannot be reasonably disputed that the Orders are an outcome stemming from the physical loss or damage to property caused by presence of the virus on such property. In fact, that is precisely what the Orders say. The "direct result" requirement does not mean that the physical loss or damage is the only reason for the issuance of the Orders; it merely requires that the Orders are an outcome marked by a "close causal relationship" with the physical loss or damage. Thus, JGO has sufficiently pled a claim for Civil Authority coverage.[7]

---

[5] *Direct*, *Merriam Webster*, https://www.merriam-webster.com/dictionary/direct.
[6] *Result*, *Lexico*, https://www.lexico.com/en/definition/result.
[7] The Magistrate erred further by holding JGO failed to sufficiently plead a claim for declaratory judgment. Because JGO has unaccrued losses that have not yet ripened such that a coercive remedy like damages is appropriate, the declaratory judgment claim would afford JGO relief

23

**III.    THE MAGISTRATE SHOULD HAVE CONSIDERED THE ABSENCE OF A VIRUS EXCLUSION – IF A VIRUS COULD NEVER CAUSE DIRECT PHYSICAL LOSS OR DAMAGE, NO SUCH EXCLUSIONS WOULD BE NECESSARY**

The Magistrate further held that the Policy's lack of a virus exclusion is not "indicative of coverage being warranted under the Policy." MTD at 19. Yet Federal does not dispute that insurers, including Federal, have long known about risks of loss from pandemics and have developed well-known exclusions for the risks or perils of pandemics, viruses, and communicable diseases. Indeed, since the mid-2000's, around the time of the first SARS outbreak, insurers began adding these exclusions to business interruption policies. *See* Christopher C. French, *Covid-19 Business Interruption Insurance Losses: The Cases For and Against Coverage*, 27 CONN. INS. L. J. 1, 4 (July 1, 2020) (Ex. B). The National Association of Insurance Commissioners reports that 82.65% percent of all business interruption policies sold in 2019 contained a virus exclusion.[8] Nevertheless, Federal would have this Court believe that more than 80% of insurers included an exclusion in their policies that was superfluous because none of those policies cover virus-related losses anyway. This is not a credible position. Were viruses incapable of causing direct physical loss or damage, there would be no need for the widespread virus exclusions in the market.

---

independent of the breach of contract claim. Indeed, at oral argument, the Magistrate queried how long JGO's damages persisted, and JGO's counsel responded that the issue is "a matter for the experts." OA Tr. at 41. Additionally, counsel asserted that JGO seeks declaratory relief with respect to how the Policy's Civil Authority coverage responds to ongoing losses and potential multiple occurrences and what qualifies as a period of restoration. *Id.* at 40-44.

[8] National Association of Insurance Commissioners, *COVID-19 Property & Casualty Insurance Business Interruption Data Call, Part 1, Premiums and Policy Information* (June 2020), https://content.naic.org/sites/default/files/inline-files/COVID-19%20BI%20Nat%27l%20Aggregates_0.pdf.

Moreover, JGO's position is not, as the Magistrate suggested, that the "absence of [a virus] exclusion. . . create[s] coverage." R&R at 19 (emphasis added). Rather, the fact that the exclusion is widely available in the marketplace suggests that insurers were aware that, absent a virus exclusion, their policies would respond to such losses. It also supports JGO's reasonable expectation that the Policy would afford coverage for the losses it sustained due to the physical loss or damage caused by SARS-CoV-2 and COVID-19. A contrary holding would mean that JGO, which purchased a policy that does not exclude virus-related losses, would be in the same position as an insured whose policy contains such an exclusion. This result would be illogical, inequitable, and contrary to the reasonable expectations of the parties. It has also been rejected by courts. *See, e.g.*, *Brown's Gym*, 2021 WL 3036545, at *21 (noting that insurer's failure to include virus exclusion in its policy while including numerous other exclusions "implies that virus-related damages are not intended to be similarly excluded from that same coverage.").

## IV.    UNDER THE MAGISTRATE'S INCORRECT REASONING, AMENDMENT WOULD BE FUTILE

While the Magistrate recommended that JGO be given leave to amend its complaint, under the reasoning in the R&R, any such amendment would likely be futile. By holding that "[n]either the presence of the droplets in the air or on surfaces caused a physical loss or damage to relevant property" (R&R at 13), the Magistrate already made a factual determination that no set of allegations could trigger coverage under the Policy. Additional factual allegations about "the nature of the physical damage or loss to property" would likely be futile where the Magistrate has previously determined none is possible. However, if the Court is inclined to grant JGO leave to amend, JGO will be able to amend its complaint to address the most up-to-date scientific understanding of COVID-19 and JGO's updated losses, which have evolved since it initially filed its complaint.

## **CONCLUSION**

For the foregoing reasons, JGO respectfully requests that the Court reject the Report and

Recommendation of the Magistrate, deny Federal's Motion, order Federal to file an Answer, and

allow the Parties to proceed to discovery.

Dated:  December 22, 2021

/s/ Kenneth Frenchman

Kenneth H. Frenchman
Meredith Elkins
Maria Brinkmann
COHEN ZIFFER FRENCHMAN &
McKENNA LLP
1350 Avenue of the Americas
New York, New York 10011
kfrenchman@cohenziffer.com
melkins@cohenziffer.com
mbrinkmann@cohenziffer.com
*Attorneys for The John Gore Organization, Inc.*

26